265 F.3d 994 (9th Cir. 2001)
 GEORGE DOWNING, AN INDIVIDUAL; PAUL STRAUCH, AN INDIVIDUAL; RICK STEERE, AN INDIVIDUAL; RICHARD BUFFALO KEAULANA, AN INDIVIDUAL; BEN AIPA, AN INDIVIDUAL; MIKE DOYLE, AN INDIVIDUAL; JOEY CABELL, AN INDIVIDUAL, PLAINTIFFS-APPELLANTS,
v.
ABERCROMBIE & FITCH, AN OHIO CORPORATION, DEFENDANT-APPELLEE.
 Nos. 00-55363, 00-55834
 UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT
 Argued and Submitted March 7, 2001
Filed September 13, 2001
 
 1
 [Copyrighted Material Omitted][Copyrighted Material Omitted][Copyrighted Material Omitted][Copyrighted Material Omitted]
 
 
 2
 Brent H. Blakely, Manhattan Beach, California, for the appellants.
 
 
 3
 Joel McCabe Smith and David Aronoff, Leopold, Petrich & Smith, P.C., Los Angeles, California, for the appellee.
 
 
 4
 Appeal from the United States District Court for the Central District of California Manuel L. Real, District Judge, Presiding D.C. No. CV-99-04612-MLR
 
 
 5
 Before: Procter Hug, Jr. and Betty B. Fletcher, Circuit Judges, and Samuel P. King, District Judge.*
 
 Hug, Circuit Judge
 Opinion by Judge Hug
 
 6
 Appellants brought this diversity action against Abercrombie and Fitch ("Abercrombie") for publishing a photograph of them, with identification of their names, for Abercrombie's commercial benefit without the Appellants' authorization. They allege a violation of California's common law and statutory prohibition against misappropriation of a person's name and likeness for commercial purposes, a violation of the Lanham Act for confusion and deception indicating sponsorship of Abercrombie goods, and a claim for negligence and defamation. The district court entered summary judgment for Abercrombie, holding that their California state claims were foreclosed because Abercrombie's use of the photograph was protected by the First Amendment, and those claims were also preempted by the federal Copyright Act; that Hawaii law was the proper choice of law for some of these claims; that the Lanham Act claim was precluded by the First Amendment and it was also precluded by the nominative fair use doctrine; and that there was insufficient evidence to sustain the negligence or defamation claims. The district court had jurisdiction under 28 U.S.C. §§ 1332, and we have appellate jurisdiction under 28 U.S.C. §§ 1291. We reverse the grant of summary judgment and remand for trial.
 
 BACKGROUND
 I. Factual Background
 
 7
 Abercrombie is an outfitter catering to young people. The upscale retailer sells casual apparel for men and women, including shirts, khakis, jeans, and outerwear. In addition to sales in approximately 200 stores nationwide, Abercrombie also sells merchandise through its subscription catalog, the "Abercrombie and Fitch Quarterly" ("Quarterly").
 
 
 8
 The Quarterly is Abercrombie's largest advertising vehicle. It accounts for approximately 80% of Abercrombie's overall advertising budget. The primary purpose of the Quarterly is to build brand awareness and increase sales. Each issue is over 250 pages in length and embraces a theme such as collegiate lifestyle, back to school, or winter wear. The Quarterly contains photographs of models wearing Abercrombie's garments as well as pictures of the clothing displayed for sale. In addition, approximately one-quarter of each issue is devoted to stories, news and other editorial pieces.
 
 
 9
 In 1998, Michael Jeffries, Abercrombie's CEO, developed a surfing theme for the upcoming Quarterly. Abercrombie held the photo shoot for the upcoming issue at San Onofre Beach, California. While at the photo shoot, Abercrombie employees Sam Shahid and Savas Abadsidis looked through a compilation of surfing photographs by surf photographer LeRoy Grannis. The photo book contained a picture of Appellants which Grannis had taken at the 1965 Makaha International Surf Championship in Hawaii. Sam Shahid purchased the photograph, along with three other photographs from the book, for $100 each. LeRoy Grannis then handwrote the names of Appellants at the bottom of the photograph.
 
 
 10
 Subsequently, Sam Shahid showed Appellants' photograph to Jeffries who decided to use the photograph in the upcoming Quarterly. Abercrombie did not obtain Appellants' permission. Jeffries also decided to create t-shirts, exactly like those worn by the Appellants in the photograph, for sale in the upcoming issue. Abercrombie labeled the t-shirts"Final Heat Tees." The t-shirts were advertised for sale in the Quarterly.
 
 
 11
 The Spring 1999 Quarterly, "Spring Fever," contains a section entitled "Surf Nekkid." The "Surf Nekkid" section includes an article recounting the history of surfing. Abercrombie also included a 700-word story, entitled"Your Beach Should Be This Cool," describing the history of Old Man's Beach at San Onofre, California. The following page exhibits the photograph of Appellants. The two pages immediately thereafter feature the "Final Heat Tees."
 
 
 12
 The "Spring Fever" issue contains other articles about the surfing lifestyle. An article entitled "Beachcombing" documents the efforts of the Surfrider Foundation, an ecological group founded by surfers. Still another article entitled "Where the Wild Things Are," written by the editor of Surfer Magazine, describes various surfer "types." Also contained in the issue is an interview of Nat Young, former world surfing champion and the first professional surfer. The interview is accompanied by photographs of Young and his son wearing Abercrombie clothing.
 
 II. Procedural History
 
 13
 On April 28, 1999, Appellants George Downing, Paul Strauch, Rick Steere, Richard Buffalo Keaulana, and Ben Aipa filed a complaint in the United States District Court for the Central District of California. Appellants later amended the complaint to add Joey Cabell and Mike Doyle. Appellants alleged that Abercrombie misappropriated their names and likenesses in violation of California's statutory and common law protections against commercial misappropriation, that the publication of the photograph in the catalog violated the Lanham Act and they alleged claims for negligence and defamation. Subsequently, Appellants and Abercrombie both filed motions for summary judgment. The district court entered summary judgment for Abercrombie. Appellants timely appealed. Abercrombie then filed a motion for attorneys' fees and other expenses. The district court granted the motion, awarding Abercrombie approximately one-fourth of the attorneys' fees that it sought. Appellants timely filed a notice of appeal from that order. We consolidated the two appeals.
 
 
 14
 On appeal, Appellants contend: (1) Abercrombie's use of the photograph is not protected under the First Amendment; (2) the state law publicity claims are not preempted by the Copyright Act; (3) California law is the proper choice of law for the claim under California Civil Code §§ 3344; (4) triable issues of fact exist with regard to the Lanham Act claims; (5) triable issues of fact exist with regard to the defamation claim; (6) the district court erred in denying the motion for a continuance; (7) the district court erred in awarding attorneys' fees and costs to Abercrombie.[1]
 
 STANDARD OF REVIEW
 
 15
 The district court's grant of summary judgment is reviewed de novo. Botosan v. Paul McNally Realty, 216 F.3d 827, 830 (9th Cir. 2000). We must determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. Lopez v. Smith, 203 F.3d 1122, 1131 (9th Cir. 2000) (en banc).
 
 ANALYSIS
 
 16
 I. First Amendment and Right of Publicity Claims
 
 
 17
 The district court concluded that Abercrombie's use of the photograph containing Appellants' names and likenesses was proper because it constituted expression protected under the First Amendment. We disagree.
 
 
 18
 California has long recognized a common law right of privacy for protection of a person's name and likeness against appropriation by others for their advantage. See Eastwood v. Superior Court, 149 Cal. App. 3d 409, 416 (Ct. App. 1983). To sustain a common law cause of action for commercial misappropriation, a plaintiff must prove: "(1) the defendant's use of the plaintiff's identity; (2) the appropriation of plaintiff's name or likeness to defendant's advantage, commercially or otherwise; (3) lack of consent; and (4) resulting injury." Id. at 417, 198 Cal.Rptr. 342.
 
 
 19
 In addition to the common law cause of action, California has provided a statutory remedy for commercial misappropriation under California Civil Code § 3344. The remedies provided for under California Civil Code § 3344 complement the common law cause of action; they do not replace or codify the common law. See Newcombe v. Adolf Coors Co. , 157 F.3d 686, 691-92 (9th Cir. 1998). Section 3344 provides in relevant part, "any person who knowingly uses another's name, voice, signature, photograph, or likeness, in any manner . . . for purposes of advertising . . . without such person's prior consent . . . shall be liable for any damages sustained by the person." Cal. Civ. Code § 3344(a). Under section 3344, a plaintiff must prove all the elements of the common law cause of action. In addition, the plaintiff must allege a knowing use by the defendant as well as a direct connection between the alleged use and the commercial purpose. See Eastwood, 149 Cal. App. 3d at 417.
 
 
 20
 Under both the common law cause of action and the statutory cause of action "no cause of action will lie for the publication of matters in the public interest, which rests on the right of the public to know and the freedom of the press to tell it." Montana v. San Jose Mercury News, Inc., 34 Cal. App. 4th 790, 793 (Ct. App. 1995). This First Amendment defense extends "to almost all reporting of recent events," as well as to publications about "people who, by their accomplishments, mode of living, professional standing or calling, create a legitimate and widespread attention to their activities. " Eastwood, 149 Cal. App. 3d at 422. However, the defense is not absolute; we must find "a proper accommodation between [the] competing concerns" of freedom of speech and the right of publicity. Id.
 
 
 21
 In the instant case, Abercrombie defends on the basis of the First Amendment arguing that the photograph illustrates an article about surfing, a matter in the public interest. To support its defense, Abercrombie relies on Dora v. Frontline Video, Inc., 15 Cal. App. 4th 536 (Ct. App. 1993). In Dora, the court held that a surfing documentary was in the public interest because it was "about a certain time and place in California history and, indeed, in American legend." Id. at 543. Dora involved a surfing legend, Mickey Dora, who sued the producer of a video documentary on surfing claiming common law and statutory appropriation of his name and likeness. See id. at 540. The trial court entered summary judgment for the film's producer and the California Court of Appeal affirmed. See id. In addressing the First Amendment issue, the court found that the documentary was about a matter of public interest, specifically surfing, and, therefore, the producer was protected by the defense. See id. at 544. In so concluding the court stated:
 
 
 22
 surfing is of more than passing interest to some. It has created a life-style that influences speech, behavior, dress, and entertainment, among other things. A phenomenon of such scope has an economic impact, because it affects purchases, travel, and the housing market. Surfing has also had a significant influence on the popular culture, and in that way touches many people. It would be difficult to conclude that a surfing documentary does not fall within the category of public affairs.
 
 
 23
 Id. at 546, 18 Cal.Rptr.2d 790.
 
 
 24
 Although the theme of Abercrombie's catalog was surfing and surf culture, a matter of public interest, the use of Appellants' names and pictures is quite different from that involved in the Dora case. In Dora, Mickey Dora's contribution to the development of the surf life-style and his influence on the sport was "the point of the program." Id . at 543, 18 Cal.Rptr. 790. Dora was depicted in the documentary because his identity directly contributed to the story about surfing which came within the protected public interest.
 
 
 25
 In the current action, there is a tenuous relationship between Appellants' photograph and the theme presented. Abercrombie used Appellants' photograph essentially as window-dressing to advance the catalog's surf-theme. The catalog did not explain that Appellants were legends of the sport and did not in any way connect Appellants with the story preceding it. In fact, the catalog incorrectly identifies where and when the photograph was taken. We conclude that the illustrative use of Appellants' photograph does not contribute significantly to a matter of the public interest and that Abercrombie cannot avail itself of the First Amendment defense.[2] Accordingly, we reverse the district court's grant of summary judgment in favor of Abercrombie.
 
 II. Federal Copyright Preemption
 
 26
 Abercrombie contends that its right to reproduce and publish the photograph of the Appellants is governed by the federal Copyright Act, 17 U.S.C. §§ 101-1101, and that Appellants' state law claims are preempted by federal copyright law.
 
 
 27
 "[W]hen acting within constitutional limits, Congress is empowered to pre-empt state law by so stating in express terms." California Fed. Sav. & Loan Ass'n v. Guerra, 479 U.S. 272, 280 (1987). Under 17 U.S.C. §§ 301, States are expressly prohibited from legislating in the area of copyright law.[3] In order for preemption to occur under the federal Copyright Act, two conditions must be satisfied. First, the content of the protected right must fall within the subject matter of copyright as described in 17 U.S.C. §§§§ 102 and 103. Second, the right asserted under state law must be equivalent to the exclusive rights contained in section 106 of the Copyright Act. See Del Madera Properties v. Rhodes & Gardner, Inc., 820 F.2d 973, 976 (9th Cir. 1987) (overruled on other grounds).
 
 
 28
 The subject matter protected by the Copyright Act is set forth in 17 U.S.C. §§ 102, which provides in relevant part as follows:
 
 
 29
 Copyright protection subsists . . . in original works of authorship fixed in any tangible medium of expression, now known or later developed, from which they can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device. Works of authorship include . . . pictorial, graphic, and sculptural works.
 
 
 30
 Section 103 provides that the subject matter specified in §§ 102 also includes compilations and derivative works,"but the copyright in a compilation or derivative work extends only to the material contributed by the author of such works as distinguished from the pre-existing material employed in the work." Section 106 gives the copyright holder exclusive rights to copy the copyrighted work or derivatives and to distribute it to the public.
 
 
 31
 The photograph itself, as a pictorial work of authorship, is subject matter protected by the Copyright Act. See 17 U.S.C. §§ 101 (providing that "pictorial, graphic, and sculptural works include . . . photographs.") However, it is not the publication of the photograph itself, as a creative work of authorship, that is the basis for Appellants' claims, but rather, it is the use of the Appellants' likenesses and their names pictured in the published photograph. The Nimmer treatise on copyright law states:
 
 
 32
 [T]he "work" that is the subject matter of the right of publicity is the persona, i.e., the name and likeness of a celebrity or other individual. A persona can hardly be said to constitute a "writing" of an"author" within the meaning of the copyright clause of the Constitution. A fortiori it is not a"work of authorship" under the Act. Such name or likeness does not become a work of authorship simply because it is embodied in a copyrightable work such as a photograph.
 
 
 33
 1 Nimmer on Copyright § 1.01[B][1][c] at 1-23 (1999). The same point is made in McCarthy's Treatise on Right of Publicity and Privacy:
 
 
 34
 The "subject matter" of a Right of Publicity claim is not a particular picture or photograph of plaintiff. Rather, what is protected by the Right of Publicity is the very identity or persona of the plaintiff as a human being . . . While copyright in a given photograph may be owned by the person depicted in it, the exact image in that photograph is not the underlying "right" asserted in a Right of Publicity case. To argue that the photograph is identical with the person is to confuse illusion and illustration with reality. Thus, assertion of infringement of the Right of Publicity because of defendant's unpermitted commercial use of a picture of plaintiff is not assertion of infringement of copyrightable "subject matter " in one photograph of plaintiff.
 
 
 35
 McCarthy, Rights of Publicity and Privacy § 11.13[C] at 1172-73 (1997).
 
 
 36
 A recent case in the Fifth Circuit held that the Texas tort of misappropriation, which provides protection from the unauthorized appropriation of one's name, image, or likeness was not preempted by the Copyright Act. See Brown v. Ames, 201 F.3d 654, 661 (5th Cir. 2000). The case involved a record company's misappropriation of the names and likenesses of individual musicians, song writers, and music producers on the company's CD's, tapes, catalogs, and posters. See id. at 656-57. The court stated that "the tort of misappropriation of a name or likeness protects a person's persona . A persona does not fall within the subject matter of copyright." Id. at 658. Thus, the court held that §§ 301 preemption does not apply.
 
 
 37
 A similar result was reached in a case decided by a California Court of Appeal, KNB Enterprises v. Matthews , 78 Cal. App. 4th 362 (Ct. App. 2000). The California Court of Appeal held that the state law right of publicity claims were not preempted by the Copyright Act. See id. at 374-75, 92 Cal.Rptr.2d 713. The copyright owner of erotic photographs, which had been displayed without authorization and for profit on an Internet website, brought suit against the website's operator asserting a misappropriation claim under California Civil Code §§ 3344. See id. at 365-66, 92 Cal.Rptr.2d 713. The court applied the two-part test for determining preemption and found that neither condition had been met. See id. at 374, 92 Cal.Rptr.2d 713. The court found that "because a human likeness is not copyrightable, even if captured in a copyrighted photograph, the models' section 3344 claims against the unauthorized publisher of their photographs are not the equivalent of a copyright infringement claim and are not preempted by federal copyright law." Id. at 365, 92 Cal.Rptr.2d 713.
 
 
 38
 We agree with the approach taken by the Fifth Circuit and the reasoning employed in KNB Enterprises. The subject matter of Appellants' statutory and common law right of publicity claims is their names and likenesses. See Newcombe, 157 F.2d at 691. A person's name or likeness is not a work of authorship within the meaning of 17 U.S.C. §§ 102. This is true notwithstanding the fact that Appellants' names and likenesses are embodied in a copyrightable photograph. The same concept is specifically embodied in 17 U.S.C. §§ 103, which provides that the copyright in derivative works extends only to the material contributed by the author as distinguished from pre-existing material employed in the work.[4]
 
 
 39
 The second requirement for copyright preemption as noted above is that the right asserted under state law must be equivalent to the exclusive rights contained in§§ 106 of the Copyright Act. This requirement also is not met. Because the subject matter of the Appellants' statutory and common law right of publicity claims is their names and likenesses, which are not copyrightable, the claims are not equivalent to the exclusive rights contained in §§ 106.
 
 III. Choice of Law
 
 40
 We review de novo a district court's decision concerning the appropriate choice of law. Abogados v. AT&T, Inc., 223 F.3d 932 (9th Cir. 2000). "In reviewing the factual findings that underlie the choice of law determination, this court must apply the clearly erroneous standard." Contact Lumber Co. v. P.T. Moges Shipping Co., Ltd., 918 F.2d 1446, 1450 (9th Cir. 1990).
 
 
 41
 Applying choice of law principles, the district court dismissed Appellants' statutory misappropriation claim as to the five Appellants who reside in Hawaii: George Downing, Rick Steere, Richard Keaulana, Ben Aipa, and Joey Cabell. We conclude that the district court erred in dismissing these claims.
 
 
 42
 In a diversity case, "federal courts apply the substantive law of the forum in which the court is located, including the forum's choice of law rules." Insurance Co. of North Am. v. Federal Express Corp., 189 F.3d 914, 921 (9th Cir. 1999). This action was brought in a district court in California. Therefore, we look to the choice of law rules applied in that state.
 
 
 43
 California applies a three-step"governmental interest" analysis to choice-of-law questions: (1) "the court examines the substantive laws of each jurisdiction to determine whether the laws differ as applied to the relevant transaction", (2) "if the laws do differ, the court must determine whether a true conflict' exists in that each of the relevant jurisdictions has an interest in having its law applied", and (3)"if more than one jurisdiction has a legitimate interest . . . the court [must] identify and apply the law of the state whose interest would be more impaired if its law were not applied." Abogados, 223 F.3d at 934; Liew v. Official Receiver & Liquidator, 685 F.2d 1192, 1196 (9th Cir. 1982). Only if both states have a legitimate but conflicting interest in applying its own law will the court be confronted with a "true conflict" case. See Insurance Co. of North Am., 189 F.3d at 921.
 
 
 44
 The California Supreme Court's decision in Hurtado v. Superior Court, 11 Cal.3d 574, 114 Cal.Rptr. 106, 522 P.2d 666 (Cal. 1974), is the primary case setting forth California's choice of law rules and analyzing the approach to be taken in determining the interest of each jurisdiction in enforcing its own law. In that case, a wrongful death action had been brought in California, where the automobile accident causing the death had occurred. The plaintiffs were residents of Mexico and the defendants residents of California. Mexican law placed a limitation on the amount that could be received in a wrongful death action (24,334 pesos or $1,946.72) whereas California law provided no such limitation. See id. at 668. The California Supreme Court stated:
 
 
 45
 generally speaking the forum will apply its own rule of decision unless a party litigant timely invokes the law of a foreign state. In such event he must demonstrate that the latter rule of decision will further the interest of the foreign state and therefore that it is an appropriate one for the forum to apply to the case before it. In the case at bench, California as the forum should apply its own measure of damages for wrongful death, unless Mexico has an interest in having its measure of damages applied.
 
 
 46
 Id. at 670 (citations omitted). In assessing the interest of California in applying its law the Court stated:
 
 
 47
 It is manifest that one of the primary purposes of a state in creating a cause of action in the heirs for the wrongful death of the decedent is to deter the kind of conduct within its borders which wrongfully takes life. It is also abundantly clear that a cause of action for wrongful death without any limitation as to the amount of recoverable damages strengthens the deterrent aspect of the civil sanction: the sting of unlimited recovery . . . more effectively penalize(s) the culpable defendant and deter(s) it and others similarly situated from such future conduct.
 
 
 48
 Id. at 672 (internal quotations and citations omitted). The court went on to emphasize that the interest in deterrence of conduct extends to "all persons within its borders." Id. at 584, 114 Cal.Rptr. 106, 522 P.2d 666.
 
 
 49
 With regard to the interest Mexico had in applying its law, the California Supreme Court stated that "[t]he interest of a state in a tort rule limiting damages for wrongful death is to protect defendants from excessive financial burdens or exaggerated claims. [A] state by enacting a limitation on damages is seeking to protect its residents from the imposition of these excessive financial burdens." Id. at 670 (citations omitted). The California Supreme Court then summarized its holding:
 
 
 50
 To recapitulate, we hold that where as here in a California action both this state as the forum and a foreign state (or country) are potentially concerned in a question of choice of law with respect to an issue in tort and it appears that the foreign state (or country) has no interest whatsoever in having its own law applied, California as the forum should apply California law.
 
 
 51
 Id. at 671.
 
 
 52
 The California Supreme Court's ruling in the Hurtado tort case is directly applicable to this case. Abercrombie distributed its Spring Quarterly in California, and any misappropriation of the names and likenesses of the Appellants would have occurred there. As the court stated, one of the primary purposes of creating a cause of action in tort is to deter misconduct within its borders by persons present within its borders. By distributing its catalog within California, Abercrombie was operating within its borders.
 
 
 53
 Hawaii, on the other hand, like Mexico in Hurtado, had no interest in limiting the extent of relief that its residents could obtain for a wrongful act against them in California. It is even more clear in this case because Hawaii did not place any limitation on recovery; instead it simply did not provide for the extent of relief California does in this type of action. It is pure fancy to believe that Hawaii would wish to restrict its residents from recovery that others could obtain in California solely because it had not enacted a statute like California's to complement its common law action for the same offense. Hawaii had no interest in having its law applied to this action brought in California.
 
 
 54
 The California Supreme Court has made it clear that when California has an interest in enforcing its law within its borders and a foreign state (in this case Hawaii) has no interest in having its law applied, then the law of California should be applied. In this case, there is no "true conflict" of Hawaii law with California law, and thus the district court erred when it applied Hawaii law to some claims. California law is applicable to all of Appellants' claims.
 
 IV. Lanham Act
 
 55
 Appellants contend that the district court erred in denying their claim under section 43(a) of the Lanham Act, 15 U.S.C. §§ 1125(a). In relevant part section 43(a)(1)(A) provides:
 
 
 56
 [A]ny person who, or in connection with any goods or services, uses any . . . false or misleading representation of fact, which . . . is likely to cause confusion, or to cause mistake, or deceive as to the affiliation, connection or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person . . . shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.
 
 
 57
 In several past cases involving celebrity plaintiffs we have looked to our decision in AMF, Inc. v. Sleekcraft Boats, 599 F.2d 341 (9th Cir. 1979), for the appropriate factors to consider in determining whether there exists a likelihood of confusion. The factors enumerated in AMF are:
 
 
 58
 1. strength of the plaintiff's mark;
 
 
 59
 2. relatedness of the goods;
 
 
 60
 3. similarity of the marks;
 
 
 61
 4. evidence of actual confusion;
 
 
 62
 5. marketing channels used;
 
 
 63
 6. likely degree of purchaser care;
 
 
 64
 7. defendant's intent in selecting the mark; and
 
 
 65
 8. likelihood of expansion of the product lines.
 
 
 66
 AMF, 599 F.2d at 348-49.
 
 
 67
 In our celebrity cases using the AMF factors we have adapted these factors so as to be applicable to the celebrity cases. We noted that the term "mark" applies to the celebrity's persona, the "strength" of the mark refers to the level of recognition that the celebrity has among the segment of the public to whom the advertisement is directed, and the term "goods" concerns the reasons for or source of the celebrity's fame. See White v. Samsung Elec. Am., Inc., 971 F.3d 1394, 1400-1401 (9th Cir. 1992).
 
 
 68
 It is perhaps clearer to restate the eight factors as applicable to the celebrity case, which can be stated as:
 
 
 69
 1. the level of recognition that the plaintiff has among the segment of the society for whom the defendant's product is intended;
 
 
 70
 2. the relatedness of the fame or success of the plaintiff to the defendant's product;3. the similarity of the likeness used by the defendant to the actual plaintiff;
 
 
 71
 4. evidence of actual confusion;
 
 
 72
 5. marketing channels used;
 
 
 73
 6. likely degree of purchaser care;
 
 
 74
 7. defendant's intent on selecting the plaintiff; and
 
 
 75
 8. likelihood of expansion of the product lines.
 
 
 76
 Although these are all factors that are appropriate for consideration in determining the likelihood of confusion, they are not necessarily of equal importance, nor do they necessarily apply to every case.
 
 
 77
 "The Lanham Act's likelihood of confusion standard is predominantly factual in nature." Wendt v. Host Int'l, Inc. 125 F.3d 806, 812 (9th Cir. 1997). Thus, summary judgment is inappropriate when a jury could reasonably conclude that there is a likelihood of confusion. Application of the eight factors to the current action leads us to conclude that the district court erred in rejecting Appellants' Lanham Act claim at the summary judgment stage.
 
 
 78
 In applying the factors to this case we reach the following conclusions. First, in considering the recognition that the Appellants have among those persons toward whom the Abercrombie catalog is directed, Appellants cite to a declaration submitted by surf historian Steve Pezman. In the declaration, Pezman asserts that Appellants "are considered legends in the surf community and are still highly well-known and regarded." This declaration from a surf historian provides some evidence that Appellants' names and images enjoy a high level of recognition among average members of society as a whole. In addition, it is undisputed that Appellants are legendary surfers, and thus there is a reasonable inference that Appellants would be known to the young people to whom the Quarterly is directed and who would be purchasing Abercrombie's surf wear.
 
 
 79
 The second factor is the relatedness of the Appellants' fame and success to the Defendant's product. Appellants' fame is due to their surfing success. Appellants' surfing success could be seen as closely-related to the Abercrombie's surf-related clothing.
 
 
 80
 Applying the third factor, the similarity of the likeness, to the Appellants is clear because it is an actual photograph of the Appellants with their names designated.
 
 
 81
 The fourth factor, evidence of actual confusion, also supports Appellants' position. Appellants provided declarations demonstrating that several individuals actually believed that Appellants were endorsing Abercrombie merchandise.
 
 
 82
 Under the fifth factor, marketing channels used, the catalog was the only marketing channel. It is therefore the likelihood of confusion in that marketing channel that is at issue.
 
 
 83
 In applying the sixth factor, the inquiry is whether consumers are likely to be particularly careful in determining who endorses the Abercrombie surf apparel, making confusion as to Appellants' endorsement more likely. A jury could reasonably find that young consumers are not likely to be particularly careful when purchasing surf-related clothing.
 
 
 84
 As to the seventh factor, the relevant question is whether the Defendants intended to profit by confusing consumers concerning the endorsement of the Abercrombie apparel. A jury could reasonably find that Abercrombie intended to indicate to consumers that these legendary surfers were endorsing Abercrombie's merchandise.
 
 
 85
 The eighth factor is the likelihood of expansion of the product lines. Neither party discusses this factor, however, no evidence has been produced that Abercrombie intends to utilize these photographs in additional product lines.
 
 
 86
 Application of these factors, leads us to conclude that the district court erred in rejecting Appellants' Lanham Act claim at the summary judgment stage. Viewing the evidence in the light most favorable to Appellants, we conclude that Appellants have raised a genuine issue of material fact concerning a likelihood of confusion as to their endorsement.
 
 V. Doctrine of Nominative Fair Use
 
 87
 The district court concluded that Appellants' Lanham Act claim was barred by the doctrine of nominative fair use. In support of its position that the district court was correct in concluding that Appellants' Lanham Act claim was barred, Abercrombie relies upon New Kids on the Block v. News America Publishing, Inc., 971 F.2d 302 (9th Cir. 1992). In New Kids, two newspapers conducted "900" number telephone polls concerning their readers' reactions to the musical group "New Kids on the Block." The newspapers charged their readers 95 cents per minute to respond to the poll. The band, which had its own competing "900" numbers for its fans, filed Lanham Act claims against the two newspapers. See id. at 304-05. The district court granted summary judgment for the defendant newspapers on First Amendment grounds. See id. at 305. On appeal, we affirmed on a nonconstitutional ground, as appropriate when the constitutional issue can be avoided. We concluded that the newspapers' use of the band name constituted a nominative fair use. See id. at 309.
 
 
 88
 We found that where the defendant uses a trademark to describe the plaintiff's product rather than its own product, a commercial user is entitled to a nominative fair use defense provided the defendant meets three requirements:
 
 
 89
 1. the product or service in question must be one not readily identifiable without use of the trademark;
 
 
 90
 2. only so much of the mark or marks may be used as is reasonably necessary to identify the product or service; and
 
 
 91
 3. the user must do nothing that would, in conjunction with the mark, suggest sponsorship or endorsement by the trademark holder.
 
 
 92
 Id. at 308. Applying the three-part test, we concluded that the newspaper was entitled to the nominative fair use defense. See id. at 308-309.
 
 
 93
 Abercrombie argues that its use of the photograph was nominative fair use in the same manner as the defendants' purported infringement in New Kids. We disagree. In New Kids, we stated that the test applies only "where the defendant uses a trademark to describe the plaintiff's product, rather than its own." Id. at 308. Here, Abercrombie used the photograph in its catalog that was intended to sell its goods. As we have noted in this case involving a celebrity endorsement claim, the mark being protected is the Appellants' names and pictures. There is a genuine issue of material fact as to whether the third criterion is met, whether Abercrombie did nothing that would in conjunction with the Appellants' names and pictures suggest sponsorship or endorsement by the Appellants.
 
 VI. Defamation Claim
 
 94
 Appellants contend they were defamed by Abercrombie's publication of the photograph in the "Surf Nekkid " section of the Quarterly. Specifically, they maintain that inclusion of their names and likenesses in a section depicting naked and scantily clothed models caused them shame and embarrassment.
 
 
 95
 Under California Civil Code § 45a, Appellants may only prevail on a libel claim if the publication is (1) libelous on its face, or (2) if special damages have been proven. See Newcombe, 157 F.3d at 694. A publication is libelous on its face only if there is no need to have explanatory matter introduced. See Cal. Civ. Code § 45a. The determination as to whether a publication is libelous on its face is one of law, and must be measured by "the effect the publication would have on the mind of the average reader." Newcombe, 157 F.3d at 695.
 
 
 96
 To support their argument that inclusion of the photograph was libelous on its face, Appellants provide three declarations. However, all three declarations are from lifetime surfers and leaders in the surf industry. The declarations do not provide evidence that an average person viewing the Quarterly would think it defamatory if Appellants' picture was included in a section in which nude models were shown. Thus, Appellants fail to satisfy the first requirement under California Civil Code §§ 45a that the publication is libelous on its face.
 
 
 97
 In order to satisfy the alternate requirement, Appellants must allege and prove that they suffered special damages as a proximate result of the publication of the photograph. See id. at 695. Special damages are defined as "all damages which plaintiff alleges and proves that he has suffered in respect to his property, business, trade, profession or occupation, including such amounts of money as the plaintiff alleges and proves he has expended as a result of the alleged libel, and no other." Cal. Civ. Code §§ 48a(4)(b). Appellants did not submit any evidence demonstrating that they incurred special damages due to Abercrombie's publication of the photograph. Thus, Appellants failed to meet either requirement under California Civil Code §§ 45a. Accordingly, we conclude that the district court did not err in denying the Appellants' defamation claim.
 
 VII. Continuance
 
 98
 Because we reverse the summary judgment, we need not address the issue the Appellants raise concerning the district judge's denial of a continuance.
 
 VIII. Attorneys' Fees
 
 99
 California Civil Code §§ 3344(a) mandates the award of attorneys' fees and costs to the "prevailing party" in actions brought under the section. See Newton v. Thomason, 22 F.3d 1455, 1464 (9th Cir. 1994). Because we reverse the judgment of the district court, the district court's award of attorneys' fees and costs to Abercrombie under California Civil Code §§ 3344 is vacated.
 
 IX. Conclusion
 
 100
 Neither the California state law claims or the Lanham Act claim are precluded by the First Amendment; the California state claims are not preempted by the federal Copyright Act; the proper choice of law to apply to these claims is California law; there is insufficient evidence to support the defamation claim; and the attorneys' fee award is vacated.
 
 
 101
 REVERSE AND REMAND FOR TRIAL.
 
 
 
 Notes:
 
 
 *
 Honorable Samuel P. King, Senior United States District Judge, sitting by designation.
 
 
 [1]
 The Appellants do not appeal the summary judgment on their negligence claim.
 
 
 [2]
 This case is also distinguishable from Hoffman v. L.A. Magazine, 255 F.3d 1180 (9th Cir. July 6, 2001), in which the defendant magazine successfully asserted a First Amendment defense to Dustin Hoffman's claim of misappropriation. In that case, L.A. Magazine used a digitally-altered picture of Hoffman, as"Tootsie," in a current designer dress to illustrate its "Grand Illusions " article. We concluded that such use was noncommercial speech entitled to full First Amendment protection. Id. at 8600. In contrast to the present case, where Abercrombie, itself, used Appellants' images in its catalog to promote its clothing, L.A. Magazine was unconnected to and received no consideration from the designer for the gown depicted in the article. Id. at 8599. Further, while L.A. Magazine merely referenced a shopping guide buried in the back of the magazine that provided stores and prices for the gown, id., Abercrombie placed the Appellants' photograph on the page immediately preceding the "Final Heat Tees" for sale. Based on these factors, we conclude that Abercrombie's use was much more commercial in nature and, therefore, not entitled to the full First Amendment protection accorded to L.A. Magazine's use of Hoffman's image. Id. at 8601.
 
 
 [3]
 Section 301(a) of 17 U.S.C. preempts:
 all legal or equitable rights that are the equivalent to any of the exclusive rights within the general scope of copyright as specified by sections 102 and 103, whether created before or after that date and whether published or unpublished, are governed exclusively by this title. Thereafter, no person is entitled to any such right or equivalent right in any such work under the common law or statutes of any State.
 
 
 [4]
 Abercrombie relies on the California case of Fleet v. CBS, 50 Cal. App. 4th 1911 (Ct. App. 1996). This case was distinguished by both the Fifth Circuit in Brown, 201 F.3d at 658, and the California Court of Appeals in KNB Enterprises, 78 Cal. App. 4th at 370-71. In Fleet, the plaintiffs were actors in a copyrighted film. The claims of the plaintiffs were based on their dramatic performance in a film CBS sought to distribute. The court stated:
 We agree that as a general proposition Civil Code section 3344 is intended to protect rights which cannot be copyrighted and that claims made under its provisions are usually not preempted. But appellants' analysis crumbles in the face of one obvious fact: their individual performances in the film White Dragon were copyrightable. Since their section 3344 claims seeks only to prevent CBS from reproducing and distributing their performances in the film, their claims must be preempted by federal copyright law.
 Fleet, 50 Cal. App. 4th at 1919. This is clearly distinguishable from this case where the Appellants' claim is based on the use of their names and likenesses, which are not copyrightable.