OPINION
KOZINSKI, Chief Judge: '
While answering a casting call for a low-budget amateur film doesn’t often lead to stardom, it also rarely turns an aspiring actress into the subject of a fatwa. But that’s exactly what happened to Cindy Lee Garcia when she agreed to act in a film with the working title “Desert Warrior.”
The film’s writer and producer, Mark Basseley Youssef — who also goes by the names Nakoula Basseley Nakoula and Sam Bacile — cast Garcia in a minor role. Garcia was given the four pages of the script in which her character appeared and paid approximately $500 for three and a half days of filming. “Desert Warrior” never materialized. Instead, Garcia’s scene was used in an anti-Islamic film titled “Innocence of Muslims.” Garcia first saw “Innocence of Muslims” after it was uploaded to YouTube.com and she discovered that her brief performance had been partially dubbed over so that she appeared to be asking, “Is your Mohammed a child molester?”
*1262 These, of course, are fighting words to many faithful Muslims and, after the film aired on Egyptian television, there were protests that generated worldwide news coverage. An Egyptian cleric issued a fatwa, calling for the killing of everyone involved with the film, and Garcia soon began receiving death threats. She responded by taking a number of security precautions and asking that Google remove the video from YouTube.
In all, Garcia filed eight takedown notices under the Digital Millenium Copyright Act. See generally 17 U.S.C. § 512. When Google resisted, she supplied substantive explanations as to why the film should be taken down. Google still refused to act, so Garcia applied for a temporary restraining order seeking removal of the film from YouTube, claiming that the posting of the video infringed her copyright in her performance.[1] The district court treated the application as a motion for a preliminary injunction, and denied it because Garcia had delayed in bringing the action, had failed to demonstrate “that the requested preliminary relief would prevent any alleged harm” and was unlikely to succeed on the merits because she’d granted Youssef an implied license to use her performance in the film.
I. Discussion
While we review the denial of a preliminary injunction for abuse of discretion, Alliance for the Wild Rockies v. Cottrell, 632 F.3d 1127,1131 (9th Cir.2011), the “legal premises underlying a preliminary injunction” are reviewed de novo. A & M Records, Inc. v. Napster, Inc., 284 F.3d 1091, 1096 (9th Cir.2002). In granting or denying a preliminary injunction, the district court must consider four factors: a plaintiffs likely success on the merits, the likelihood that irreparable harm will result if an injunction doesn’t issue, the balance of equities and the public interest. Winter v. Natural Res. Def. Council, 555 U.S. 7, 20, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008). The district court found against Garcia on the first two factors and didn’t consider the last two.[2]
A. Likelihood of Success on the Merits
Garcia doesn’t claim a copyright interest in “Innocence of Muslims” itself; far from it. Instead, she claims that her performance within the film is independently copyrightable and that she retained an interest in that copyright. To succeed on this claim, Garcia must prove not only that she likely has an independent interest in her performance but that Youssef doesn’t own any such interest as a work for hire and that he doesn’t have an implied license to use her performance.
1. An Independent Copyright Interest
A film is typically conceived of as “a joint work consisting of a number of *1263 contributions by different ‘authors.’ ” 1 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 6.05 at 6-14 (1990). Garcia argues that she never intended her performance to be part of a joint work, and under our precedent she doesn’t qualify as a joint author. See Aal-muhammed v. Lee, 202 F.3d 1227,1231-36 (9th Cir.2000). But just because Garcia isn’t a joint author of “Innocence of Muslims” doesn’t mean she doesn’t have . a copyright interest in her own performance within the film.[3]
Whether an individual who makes an independently copyrightable contribution to a joint work can retain a copyright interest in that contribution is a rarely litigated question. See Thomson v. Larson, 147 F.3d 195, 206 (2d Cir.1998) (dismissing similar argument on procedural grounds); see also David Nimmer, Address, Copyright in the Dead Sea Scrolls: Authorship and Originality, 38 Hous. L.Rev. 1, 186-87 & n. 942 (2001). But nothing in the Copyright Act suggests that a copyright interest in a creative contribution to a work simply disappears because the contributor doesn’t qualify as a joint author of the entire work. 17 U.S.C. § 102(a) (“Copyright protection subsists ... in original works of authorship fixed in any tangible medium.... ”). Where, as here, the artistic contribution is fixed, the key question remains whether it’s sufficiently creative to be protectible.[4]
Google argues that Garcia didn’t make a protectible contribution to the film because Youssef wrote the dialogue she spoke, managed all aspects of the production and later dubbed over a portion of her scene. But an actor does far more than speak words on a page; he must “live his part inwardly, and then ... give to his experience an external embodiment.” Constan-tin Stanislavski, An Actor Prepares 15, 219 (Elizabeth Reynolds Hapgood trans., 1936). That embodiment includes body language, -facial, expression and reactions to other actors and elements of a scene. Id. at 218-19. Otherwise, “every shmuck ... is an actor because everyone ... knows how to read.” Sanford Meisner & Dennis Longwell, Sanford Meisner on Acting 178 (1987).
An actor’s performance, when fixed, is copyrightable if it evinces “some minimal degree of creativity ... ‘no matter how crude, humble or obvious’ it might be.” Feist Publ’ns, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 345, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991) (quoting 1 Nimmer on Copyright § 1.08[C][1]). That is true whether the actor speaks, is dubbed over or, like Buster Keaton, performs without any words at all. Cf. 17 U.S.C. § 102(a)(4) (noting “pantomimes and choreographic works” are eligible for copyright protection). It’s clear that Garcia’s performance meets these minimum requirements.
Aalmuhammed isn’t. to the contrary because it does not, as the dissent would have it, “articúlate! ] general principles of authqrship.” Dissent at 1272. *1264 Aalmuhammed only discusses what is required for a contributor to a work to assert joint ownership over the entire work: “We hold that authorship- is required under the statutory definition of a joint work, and that authorship is not the same thing as making a valuable and copyrightable contribution.” 202 F.3d at 1232. Aalmu-hammed plainly contemplates that an individual can make a “copyrightable contribution” and yet not become a joint author of the whole work. Id. For example, the author of a single poem does not necessarily become a co-author of the anthology in which the poem is published. It makes sense to impose heightened requirements on those who would leverage their individual contribution into ownership of a greater whole, but those requirements don’t apply to the copyrightability of all creative works, for which only a “minimal creative spark [is] required by the Copyright Act and the Constitution.” Feist Publ’ns, 499 U.S. at 363, 111 S.Ct. 1282.[5]
Nor does Midler v. Ford Motor Co., 849 F.2d 460 (9th Cir.1988), speak to the problem before us. First, of course, Midler isn’t a copyright case at all — it’s a right of publicity case that happens to discuss copyright in the context of preemption, not infringement. Second, Midler discusses the copyrightability of a performer’s voice — not her performance. See 849 F.2d at 462. A performer’s voice is analogous to her image, which we’ve said “is not a work of authorship” under the Copyright Act. Downing v. Abercrombie & Fitch, 265 F.3d 994, 1004 (9th Cir.2001). But that doesn’t answer the question of whether the artist’s creativity, expressed through her voice or image, is protected by copyright. Just because someone’s voice — its particular timbre and quality — can’t be copyrighted, doesn’t mean that a performance made using that voice can never be protected. In fact, many vocal performances are copyrighted. See, e.g., Laws v. Sony Music Entm’t, Inc., 448 F.3d 1134, 1141 (9th Cir.2006).
Recognizing that Garcia may have a copyright interest in her performance isn’t the end of the inquiry. A screenplay is itself a copyrightable creative work and a film is a derivative work of the screenplay on which it is based. See Gilliam v. Am. Broad. Cos., .538 F.2d 14, 20 (2d Cir.1976); see also 17 U.S.C. § 101; 2 Nimmer on Copyright § 2.10[A] n. 8. Where, as here, an actor’s performance is based on a script, the performance is likewise derivative of the script, such that the actor might be considered to have infringed the screenwriter’s copyright. And an infringing derivative work isn’t entitled to copyright protection. See 17 U.S.C. § 103(a); see also U.S. Auto Parts Network, Inc. v. Parts Geek, LLC, 692 F.3d 1009, 1016 (9th Cir.2012).
Of course, by hiring Garcia, giving her the script and turning a camera on her, Youssef implicitly granted her a license to perform his screenplay. See Effects Assocs., Inc. v. Cohen, 908 F.2d 555, 558-59 (9th Cir.1990). This doesn’t mean that Garcia owns a copyright interest in *1265 the entire scene: She can claim copyright in her own contribution but not in “preexisting material” such as the words or actions spelled out in the underlying script. 17 U.S.C. § 103(b); see also U.S. Auto Parts Network, Inc., 692 F.3d at 1016. Garcia may assert a copyright interest only in the portion of “Innocence of Muslims” that represents her individual creativity, but even if her contribution is relatively minor, it isn’t de minimis. See Feist, 499 U.S. at 359, 363, 111 S.Ct. 1282. We need not and do not decide whether every actor has a copyright in his performance within a movie. It suffices for now to hold that, while the matter is fairly debatable, Garcia is likely to prevail. ,
As the above discussion makes clear, any analysis of the rights that might attach to the numerous creative contributions that make up a film can quickly become entangled in an impenetrable thicket of copyright. But it rarely comes to that because copyright interests in the vast majority of films are covered by contract, the work for hire doctrine or implied licenses. See F. Jay Dougherty, Not a Spike Lee Joint? Issues in the Authorship of Motion Pictures Under U.S. Copyright Law, 49 UCLA L.Rev. 225, 238, 317-18, 327-33 (2001). Here, Google argues that Garcia’s performance was a work made for hire or, alternatively,’ that she granted Youssef an implied license to use her performance in “Innocence of Muslims.”
2. Work For Hire
Under the work for hire doctrine, the rights to Garcia’s performance vested in Youssef if Garcia was Youssef s employee and acted in her employment capacity or was an independent contractor who transferred her interests in writing. See 17 U.S.C. §§ 101, 201(b); see also Cmty. for Creative Non-Violence v. Reid, 490 U.S. 730, 751, 109 S.Ct. 2166, 104 L.Ed.2d 811 (1989).
The “term ‘employee’ ” refers “to a hired party in a conventional employment relationship,” and the question of employment is analyzed under traditional principles of agency. Reid, 490 U.S. at 743, 751, 109 S.Ct. 2166. Garcia’s case is a good example of why it is difficult to categorize an actor, particularly one in a small role, as a conventional employee. Youssef hired Garcia for a specific task, shé only worked for three days and she claims she received no health or other traditional employment benefits. See id. at 751-52, 109 S.Ct. 2166. As we’ve recognized, this difficulty is why 17 U.S.C. § 101 “specifically addresses the movie ... industr[y], affording moviemakers a simple, straightforward way of obtaining ownership of the copyright in a creative contribution — namely, a written agreement.” Effects Assocs., 908 F.2d at 558. Youssef didn’t obtain a written agreement,[6] and Garcia simply doesn’t qualify as a traditional employee on this record.
The dissent believes Garcia was an employee primarily because ‘Youssef controlled] both the manner and means of making the film, including the scenes featuring Garcia” and, Youssef “was engaged in the business of film making at the time.” Dissent at 1275. But there’s no evidence *1266 in the record that Youssef directed the film or that he controlled the manner in which any part of the film — much less Garcia’s scene — was shot. In fact, Youssef has claimed only that he wrote the screenplay.
There’s nothing in the record to suggest that Youssef was in the “regular business” of making films. Reid, 490 U.S. at 752, 109 S.Ct. 2166. He’d held many jobs, but there’s no indication he ever worked in the film industry. And there’s no evidence he had any union contracts, relationships with prop houses or other film suppliers, leases of studio space or distribution agreements. The dissent would hold that Youssef was in the “regular business” of filmmaking simply because he made “Innocence of Muslims.” But if shooting a single amateur film amounts to the regular business of filmmaking, every schmuck with a video-camera becomes a movie mogul.
3. Implied License
A non-exclusive license may be implied from conduct and arises where a plaintiff “create[s] a work at defendant’s request and hand[s] it over, intending that defendant copy and distribute it.” Effects Assocs., 908 F.2d at 558. We’ve found an implied license where the plaintiffs contribution to a film or other work would otherwise be worthless or of “minimal value.” Id. at 559; see also Oddo v. Ries, 743 F.2d 630, 634 (9th Cir.1984). That is the case here. Garcia auditioned for a role in a particular film, was paid for her performance and had every reason to believe Yous-sef would eventually release the film. Without an implied license, the performance for which she was paid would be unusable. Therefore, we agree with Google that Garcia granted Youssef an implied license.
Any such license must be construed broadly. If the scope of an implied license was exceeded merely because a film didn’t meet the ex ante expectation of an actor, that license would be virtually meaningless. See Foad Consulting Grp., Inc. v. Azzalino, 270 F.3d 821, 837-38 (9th Cir. 2001) (Kozinski, J., concurring). A narrow, easily exceeded license could allow an actor to force the film’s author to re-edit the film — in violation of the author’s exclusive right to prepare derivative works. See 17 U.S.C. § 106(2). Or the actor could prevent the film’s author from exercising his exclusive right to show the work to the public. See 17 U.S.C. § 106(4). In other words, unless these types of implied licenses are construed very broadly, actors could leverage their individual contributions into de facto authorial control over the film.[7]
Nevertheless, even a broad implied license isn’t unlimited. See Oddo, 743 F.2d at 634. Garcia was told she’d be acting in an adventure film set in ancient Arabia. Were she now to complain that the film has a different title, that its historical depictions are inaccurate, that her scene is poorly edited or that the quality of the film isn’t as she’d imagined, she wouldn’t have a viable claim that her implied license had been exceeded. But the license Garcia granted Youssef wasn’t so *1267 broad as to cover the use of her performance in. any project. Here, the problem isn’t that “Innocence of Muslims” is not an Arabian adventure movie: It’s that the film isn’t intended to -entertain at all. The film differs so radically from anything Garcia could have .imagined when she was cast that it can’t possibly be authorized by any implied license she granted Youssef.
A clear sign that Youssef exceeded the bounds of any license is that he lied to Garcia in order to secure her participation, and she agreed to perform in reliance on that lie. Youssefs fraud alone is likely enough to void any agreement he had with Garcia. See 26 Samuel Williston & Richard A. Lord, A Treatise on the Law of Contracts § 69:4 (4th ed.2003). But even if it’s not, it’s clear evidence that his inclusion of her performance in “Innocence of Muslims” exceeded the. scope of the implied license and was, therefore, an unauthorized, infringing use.
The situation in'which a filmmaker uses a performance in a way'that exceeds the bounds of the broad implied license granted by an actor will be extraordinarily rare. But this is such a case. Because it is, Garcia has demonstrated that she’s likely to succeed on the merits of her claim. Winter, 555 U.S. at 20, 129 S.Ct. 365.
B. Irreparable Harm
Garcia argues that she suffers irreparable harm both because of the ongoing infringement of her copyright and because that infringement subjects her to continuing, credible death threats. Irreparable harm isn’t presumed in copyright cases. Perfect 10, Inc. v. Google, Inc., 653 F.3d 976, 980-81 (9th Cir.2011). Therefore, Garcia must show that the damage to her reputation and threats against her life constitute irreparable harm.
The district court found that Garcia failed to make this required showing, primarily because she didn’t bring suit until several months after “Innocence of Muslims” was uploaded to YouTube. It’s true that a “long delay before seeking a preliminary injunction implies a lack- of urgency and irreparable harm.”. Oakland Tribune, Inc. v. Chronicle Publ’g Co., 762 F.2d 1374, 1377 (9th Cir.1985). But this is so because a preliminary injunction is based “ ‘upon the theory that there is an urgent need for speedy action’ ” and by “ ‘sleeping on its rights a plaintiff demonstrates [a] lack of ” urgency. Lydo Enters., Inc. v. City of Las Vegas, 745 F.2d 1211, 1213 (9th Cir.1984) (quoting Gillette Co. v. Ed-Pinaud, Inc., 178 F.Supp. 618, 622 (S.D.N.Y.1959)). There’s no dispute that, here, Garcia took legal action as soon as the film received worldwide attention and she began receiving death threats-r&emdash;in other words, as soon as there was a “need for speedy action.” Id. Because the need for immediate action didn’t arise until she was threatened, Garcia wasn’t dilatory in bringing the lawsuit.
The harm Garcia complains of is real and immediate. See City of L.A. v. Lyons, 461 U.S. 95, 111, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983). She has provided un-refuted evidence that the threats against her are ongoing and serious, she has already been forced to take significant security precautions when traveling and she moved to a new home and relocated her business as a safety measure. Although past injuries aren’t sufficient to establish irreparable harm for purposes of an injunction, id. at 103, 103 S.Ct. 1660, Garcia has amply demonstrated that, absent an injunction, she’ll continue to suffer . concrete harms&emdash;whether in the form of ongoing security requirements or actual harm to her person.
*1268 Beyond establishing that she faces an imminent harm, Garcia must show a “sufficient causal connection” between that harm and the conduct she seeks to enjoin such that the injunction would- effectively curb the risk of injury. Perfect 10, 653 F.3d at 981-82. Despite her understandable focus on the threats against her life, Garcia has brought a copyright action. Therefore, she needs to show that the harm she alleges is causally related to the infringement of her copyright.
She’s made such a showing. Youssef s unauthorized inclusion of her performance in “Innocence of Muslims” undisputedly led to the threats against Garcia. Google argues that any harm arises- solely out of Garcia’s participation in “Innocence of Muslims”- and not out- of YouTube’s continued hosting of the film. But Garcia has shown that removing the film from YouTube will help disassociate her from the film’s anti-Islamic message and that such disassociation will keep her from suffering future threats and physical harm. Although Google asserts that the film is so widespread that removing it from YouTube will have no effect, it has provided no evidence to support this point.[8]' Taking down the film from YouTube will remove it from a prominent online platform—the platform on which it was first displayed— and will curb the harms of which Garcia complains.
It is not irrelevant that the harm Garcia complains of is death or serious bodily harm, which the dissent fails to mention. Death is an “irremediable and unfathomable” harm, Ford v. Wainwright, 477 U.S. 399, 411, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986), and bodily injury is not far behind. To the extent the irreparable harm inquiry is at all a close question, we think it best to err on the side of life.
C. Balance of the Equities and The Public Interest
Youssef lied to Garcia about the project in which she was participating. Her performance was used in a way that she found abhorrent and her appearance in the film subjected her to threats of physical harm and even death. Despite these harms, and despite Garcia’s viable copyright claim, Google refused to remove the film from YouTube. It’s hard to see how Google can defend its refusal on equitable grounds and, indeed, it doesn’t really try. Instead, it argues that an injunction would be inequitable because of the overwhelming public interest in the continued hosting of “Innocence of Muslims” on YouTube.
The problem with Google’s position is that it rests entirely on the assertion that Garcia’s proposed injunction is an unconstitutional prior restraint of speech. But the First Amendment doesn’t protect copyright infringement. Cf. Eldred v. Ashcroft, 537 U.S. 186, 219-220, 123 S.Ct. 769, 154 L.Ed.2d 683 (2003). Because Garcia has demonstrated a likelihood of success on her claim that “Innocence of *1269 Muslims” infringes her copyright, Google’s argument fails. The balance of equities therefore clearly favors Garcia and, to. the extent the public interest is implicated at all, it, too, tips in Garcia’s direction.
This is a troubling case. Garcia was duped into providing an artistic performance that was used in a way she never could have foreseen. Her unwitting and unwilling inclusion in “Innocence of Muslims” led to serious threats against her life. It’s disappointing, though perhaps not surprising, that Garcia needed to sue in order to protect herself and her rights.
But she has sued and, more than that, she’s shown that she is likely to succeed on her copyright claim, that she faces irreparable harm absent an injunction and that the balance of equities and the public interest favor her position. The district court abused its discretion in finding otherwise.
REVERSED AND REMANDED[9]

. Although Garcia's suit also named the film’s producers, only Google, which owns YouTube, answered the complaint.

. The dissent suggests that we must defer to the district court's statement that "the nature of [Garcia’s] copyright interest is not clear.” But we defer to a lower court’s decision, not its equivocation.
It's worth noting what the district court’s three-page order doesn’t do: It doesn't decide whether Garcia has a copyright interest in her performance, whether her performance is a "work,” whether Garcia is the "author” of her performance or whether her performance is a work for hire. Nor does it address the balance of the equities or the public interest, despite the fact that a district court must "weigh in its analysis the public interest implicated by [an] injunction, as Winter now requires.” Stormans, Inc. v. Selecky, 586 F.3d 1109, 1138 (9th Cir.2009).

. Although the dissent claims that “Garcia’s interest in her acting performance may best be analyzed as a joint work with Youssef,” Dissent at 1271 n. 3, it doesn’t explain why. A work is joint only if the authors involved-in its creation intend that it be so. See 17 U.S.C. § 101. Garcia expressly disclaims such intent and there is no evidence in the record that Youssef intended to create a joint work.

. Neither party raised the issue of whether the author of a dramatic performance must personally .fix his work in.a tangible medium. Because the question is not properly before us, we do not decide it. The parties are free to raise it in the district court on remand.

. Our decision today does not "read[] the authorship requirement out of the Copyright Act and the Constitution.” Dissent at 1272. An author "in a constitutional sense” is one " 'to whom anything owes its origin; originator; maker.' " Feist Publ’ns, 499 U.S. at 346, 111 S.Ct. 1282 (quoting Burrow-Giles Lithographic Co. v. Sarony, 111 U.S. 53, 58, 4 S.Ct. 279, 28 L.Ed. 349 (1884)). In other words, the creator of copyrightable artistic expression is an author. Which is why, for example, Sinéad O'Connor can claim a copyright in her performance of "Nothing Compares 2 U” even though the song was written by Prince.

. Neither party claims that Garcia signed, a work for hire agreement. In the district court, Google produced an agreement, purportedly signed by Garcia, that transferred all of her rights in her performance to the film’s producers. Garcia responded by submitting the declaration of a handwriting expert opining that Garcia’s signature had been forged. The district court didn’t address the agreement or its authenticity.

. Construing such implied licenses narrowly would also undermine our joint authorship jurisprudence. Most actors don't qualify as joint authors. See Aalmuhammed, 202 F.3d at 1232-33. Yet, if any actor who doesn’t like the final version of a movie could keep it from being released, he’d have more control over the film than a joint author. See 1 Nimmer on Copyright § 6.10[A][l][a], at 6-36 ("[A] joint owner may exploit the work himself, without obtaining the consent of the other joint owners.”).

. Contrary to the dissent's suggestion, Garcia’s affidavit doesn't establish that the film has been "widely discussed and disseminated.” Dissent at 1276. It states only that Garcia reached out to the media to let the world know that she "d[id] not condone the film.” We reject the dissent’s uncharitable argument that Garcia should be penalized for attempting to protect her life and reputation by distancing herself from "Innocence of Muslims.” We also reject Google's preposterous argument that any harm to Garcia is traceable to her filing of this lawsuit. Any publicity generated by Garcia’s lawsuit is a necessary product of her attempt to protect herself and her legal rights after Google refused to do so.

. Concurrent with this opinion, we have issued- an order directing Google to take down all copies of "Innocence of Muslims” from YouTube and any other platforms within its control and to take all reasonable steps to prevent further uploads. This temporary injunction shall remain in place until the district court is able to enter a preliminary injunction consistent with our opinion.