[No. A126374. First Dist., Div. Four. Dec. 29, 2011.]

ORTHOPEDIC SYSTEMS, INC., Plaintiff, Cross-defendant and Respondent, v.
ALLEN SCHLEIN, Defendant, Cross-complainant and Appellant.

[No. A126821. First Dist., Div. Four. Dec. 29, 2011.]

ORTHOPEDIC SYSTEMS, INC., Plaintiff, Cross-defendant and Appellant, v.
ALLEN SCHLEIN, Defendant, Cross-complainant and Respondent.

**[CERTIFIED FOR PARTIAL PUBLICATION***]**

---

*Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part III.B., C.

COUNSEL

Kreindler & Kreindler, Gretchen M. Nelson, Gabriel S. Barenfeld, Jacob H. Mensch and Andrew L. Ciganek for Defendant, Cross-complainant and Appellant and for Defendant, Cross-complainant and Respondent.

Reed Smith, John S. Siamas, Karen A. Braje and Dennis Peter Maio for Plaintiff, Cross-defendant and Respondent and for Plaintiff, Cross-defendant and Appellant.

OPINION

**REARDON, J.**—The instant appeals involve the contract and tort claims of an orthopedic surgeon who had an agreement with an orthopedic products company regarding the creation and sale of a medical device that bore the surgeon's name. After paying royalties to the surgeon for more than a decade,

the company renounced its obligations to pay anything further for the medical device even though it still sold a version of the product bearing the surgeon's name.

Orthopedic Systems, Inc. (OSI), and Allen Schlein, M.D., entered into an agreement in which OSI acknowledged receipt of a medical device called the "Schlein Shoulder Positioner," and obligated itself to pay Dr. Schlein royalties on sales of the resulting product. After OSI stopped paying the royalties, Dr. Schlein threatened to sue for breach of contract, prompting OSI to file an action seeking a declaration of rights under the agreement. Dr. Schlein cross-complained for breach of contract, conversion, and commercial misappropriation of his name among other things. The jury found in favor of Dr. Schlein on his contract claim and awarded $616,043 in damages. The jury also awarded Dr. Schlein $750 in statutory damages for his misappropriation claim, and found that OSI earned $1.22 million in profits attributable to the use of Dr. Schlein's name. The trial court, however, did not include the profits in the judgment.

Dr. Schlein appeals, challenging the exclusion of the profits from the judgment. OSI appeals the judgment, the denial of its judgment notwithstanding the verdict, and the postjudgment award of attorney fees.

We modify the judgment and otherwise affirm.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

### A.  *Facts*[1]

#### 1.  *OSI's Product Development*

OSI was formed by Robert Moore, an experienced chiropractor, and his family in 1977 to develop, manufacture and sell orthopedic devices. Prior to forming OSI, Moore had invented several products to help his patients. In early 1980, Moore hired Steven Lamb to head up the engineering department at OSI.

Moore attended orthopedic trade shows and conferences, where he encouraged physicians to bring ideas and concepts to OSI in exchange for a royalty, telling them "If you have a problem, let me know, I will then try to develop a

---

[1] We recite the facts taken from the reporter's transcript and joint appendix. As required by the rules of appellate procedure, we state the facts in the light most favorable to the judgment. (*DiMartino v. City of Orinda* (2000) 80 Cal.App.4th 329, 336 [95 Cal.Rptr.2d 16].)

product or [way] of solving that [problem] to make your life easier and [to do] a better job for the patient and then we will pay you a royalty of five percent on that."

Moore worked closely with the physicians who brought their problems to OSI, discussing possible improvements and modifications. The product would then "evolve from that interface or interaction."

In lieu of legal formalities, Moore offered the physicians a "handshake agreement," whereby OSI would pay a royalty to the physician for as long as OSI sold the product. Nothing other than Moore's word was required; he said OSI "would pay and [it] did." Moreover, there was never any requirement that a physician participate in the modification of a product in order to continue to receive the royalties.

### 2. OSI's Initial Collaboration with Dr. Schlein

Dr. Schlein, an experienced orthopedic surgeon and inventor, met Moore in the early 1980's at a medical conference. Dr. Schlein and Moore started working together shortly thereafter on a cast padding product that Dr. Schlein was already manufacturing through subcontractors. Moore agreed to distribute the product without any formal written agreement.

In 1986 or 1987, Dr. Schlein brought OSI another product called the "Dynafix," which was a plastic external fixator for wrist fractures. Moore agreed to manufacture the product and sell it, and agreed to pay Dr. Schlein a royalty for as long as OSI continued to sell the product. There was no formal written agreement between OSI and Dr. Schlein when OSI initially agreed to sell the Dynafix.

### 3. Genesis of the Schlein Shoulder Positioner

In the mid-1980's, as arthroscopic surgery became a popular alternative to traditional surgery, Dr. Schlein found it difficult to perform arthroscopic shoulder surgery with a patient lying on the operating table.[2] Then, in or about 1988, Dr. Schlein attended a meeting on arthroscopic surgery where another surgeon described performing shoulder surgery with a "beach chair" that elevated the patient into a seated position.

---

[2] Arthroscopic surgery is performed through small incisions in the area surrounding a joint or organ. The surgeon inserts a scope or a camera through one incision and then inserts the instruments through the other incisions. This technique contrasts with traditional open surgical methods where the surgeon essentially cuts open the area for surgery.

Dr. Schlein thought the beach chair concept was a good one, and he went home and started to think about how he could create something like it. Although Dr. Schlein thought he could make one, he was having trouble creating a locking or "gatch" mechanism to support the backrest.[3]

When Dr. Schlein told Moore about his difficulty in crafting a mechanism to lock the device, Moore sent him one of OSI's radiolucent tilt tables. Dr. Schlein took the table apart and extracted the gatch mechanism. He bought some plastic and went home to make the back piece of the positioner. Dr. Schlein enlisted the help of a plastic prototype maker, who helped make the head piece. Dr. Schlein then combined all of the parts and tested the device in surgery.

Dr. Schlein then sent the prototype of the positioner to Moore. After multiple discussions regarding the device, Dr. Schlein and Moore decided to work together on manufacturing it for sale through OSI. Dr. Schlein and Moore also discussed the development of a disposable pad set or "patient care kit" to be used with the shoulder positioner that would provide cushioning for the patients.

Starting in or about 1989, Dr. Schlein and Moore worked collaboratively on the shoulder positioner. Dr. Schlein understood that his agreement with OSI would be the same as it was with the Dynafix—OSI would manufacture and sell the positioner and Dr. Schlein would receive a royalty for as long as OSI sold the product. Moore had the same understanding about the arrangement. Indeed, in a handwritten note dated December 28, 1990, Moore noted that for the shoulder positioner "Schlein gets 5% royalty + Disp Pad Set." Dr. Schlein was not required to work on any subsequent modifications of the product in order to receive the agreed-upon royalties.

### 4. *Sale of OSI*

In or about March 1989, Moore and his family began to contemplate the sale of OSI. To that end, Moore engaged the services of a company that would assist in finding a purchaser for OSI. Once the prospective purchasers were found, Moore was required to document all of OSI's royalty agreements. As such, Moore drafted a form agreement to document the verbal handshake agreements he had with the physicians who sold products through OSI.

---

[3] Dr. Schlein thought about buying a hospital bed and cutting the back off it because gatch mechanisms were used to keep the manual beds in an upright position.

In early 1992, Dr. Schlein received a one-page agreement from Moore regarding the Schlein Shoulder Positioner (1992 Agreement), which provided as follows:

"[OSI] of Hayward, CA has received a product improvement idea from Dr. Allen Schlein. It is called the Schlein Shoulder Positioner.

"[OSI] will manufacture (or have manufactured) the device and will market the device.

"In return, [OSI] will pay a royalty of 5% of the list price less discounts to the Adam David Schlein trust fund.

"It is understood that a disposable pad set is being investigated. Should OSI determine that a disposable set is desirable and markets the pad set, a 5% royalty on the list price less discounts will apply.

"The royalties will be paid the 30th day of the month following the calendar quarter.

"Dr. Schlein, or his representatives shall have any reasonable opportunity to audit the sales of the device at his expense, should he so desire.

"The device has been assigned a product number for sales and accounting purposes. The pad set will also be assigned a product [number]."[4]

Dr. Schlein signed the agreement on January 10, 1992, and returned it to Moore.[5] Dr. Schlein had nothing to do with the drafting of the 1992 Agreement. Dr. Schlein had no recollection of having any conversations with Moore either before or after he signed the written agreement.

In 1992, Moore and his family sold OSI to Marc Abramowitz and Allan Epstein. A portion of the sales agreement prepared by Moore and OSI expressly disclosed that as to the shoulder positioner, as well as other products, "[r]oyalties are payable for as long as OSI sells the product."

### 5. Subsequent Sale of OSI

In 1995, Abramowitz and Epstein sold 51 percent of OSI's stock to Mizuho Ikakogyo Co., Ltd. In the stock purchase agreement, OSI represented

---

[4] The device was assigned the product number of 5336.

[5] Moore also sent Dr. Schlein a similar agreement for the Dynafix, which Dr. Schlein signed and returned to Moore.

that "[p]ursuant to a letter agreement dated January 10, 1992, Dr. Allen Schlein licenses OSI the Schlein Shoulder Positioner."

Following subsequent litigation and Mizuho's eventual acquisition of the remaining 49 percent of OSI's stock, Abramowitz and Epstein agreed to refrain from making any competing products and from undermining the value of OSI. The Schlein Shoulder Positioner was expressly identified as one of the products in the noncompetition agreement due to its economic value to OSI.

### 6. OSI Modifications to the Schlein Shoulder Positioner

Until 1999, OSI marketed and sold the shoulder positioner under the name "Schlein Shoulder Positioner" or "Schlein Shoulder Positioner SSP 1000." In marketing brochures and in the instruction guide, OSI stated: "The manufacturer thanks Allen P. Schlein, M.D. for his assistance in the development of the OSI Schlein Shoulder Positioner SSP-1000."

In 1999, OSI modified parts of the backrest and added a chinstrap that had been designed and patented by Lamb. OSI also changed the name of the device to the "Schlein II Universal Shoulder Positioner" and changed the product number to 5338.

OSI also modified the text of its brochures to state "[OSI] thanks [Allen] P. Schlein, M.D., for his assistance in the development of the OSI Schlein II Universal Shoulder Positioner." OSI continued to pay Dr. Schlein for the sales of the Schlein II Universal Shoulder Positioner and the patient care kits.

In 2001, OSI changed the name of the device to the "Schlein Ultra" and changed the product number from 5338 to 5358. In the marketing brochures and user guide, OSI thanked Dr. Schlein for his "assistance in the development of the OSI Schlein Ultra™ Shoulder Positioner."

OSI did not inform Dr. Schlein that it was changing the product number. OSI continued to pay Dr. Schlein royalties for the sales of the Schlein Ultra Shoulder Positioner and the patient care kits.

### 7. OSI Trademarks Dr. Schlein's Name

In 2001, OSI applied to trademark the name "Schlein Ultra" to the shoulder positioner. The application was approved by Lamb, who at that time was OSI's chief operating officer. Lamb also signed a declaration attesting to OSI's alleged ownership of the name "Schlein Ultra."

Lamb filed the trademark application because competitors were using Dr. Schlein's name on competing shoulder positioners and/or patient care kits. However, prior to filing the application, neither Lamb nor anyone else at OSI asked Dr. Schlein for his authority to trademark his name to the positioner.

The trademark registration was issued to OSI on September 21, 2004.

### 8. *OSI Stops Paying Royalties to Dr. Schlein*

On January 21, 2005, Lamb sent a letter to Dr. Schlein, remitting his royalty check for the fourth quarter of 2004 and advising him as follows: "As you know, OSI has paid you [a] royalty on the shoulder positioner according to the agreement signed by Bob Moore since January 1991. In light of the fact that there is no patent protection on the product and this product is in a very competitive market, it has become economically unfeasible to continue this program. It is our standard practice to pay royalties on unpatented products at a rate of 2.5% for no more than ten years. In this case, we are nearing the end of the 14th year and we have generously paid you a 5% royalty. In light of our long relationship, I am proposing that we continue this royalty at 2.5% of [the] sales for 2 more calendar quarters (i.e., through June 30, 2005) after which the royalty will be discontinued."

Prior to sending the letter to Dr. Schlein, Lamb did not do anything to determine whether it was economically feasible to continue the royalty program. Indeed, OSI's records indicated steady sales of the positioner and pad sets from 2000 through 2005.

### 9. *OSI Continues to Sell Shoulder Positioner Using Dr. Schlein's Name*

Although OSI tendered the last royalty payment to Dr. Schlein in January 2005, at least until July 29, 2005, OSI continued to market and sell the shoulder positioner and pad sets using Dr. Schlein's name.

During the period January 1, 2005, to July 31, 2005, OSI's total revenues on sales of the shoulder positioner and pad sets were $2,033,333.[6] Dr. Schlein's economic expert opined that the profit OSI earned on the forgoing sales was $1.22 million, using a 60 percent profit margin; this amount did not include royalties that were due Dr. Schlein for that period, which was equal to 5 percent of $2,033,333 or $101,667.

---

[6] From 1993 through 2007, OSI's total sales on the positioner and pad sets were $28,615,000.

OSI eventually changed the name of the shoulder positioner to the "Ultra Shoulder [P]ositioning [D]evice." In all respects, there was no difference between the Schlein Ultra Shoulder Positioner and the Ultra Shoulder Positioning Device.

### B.  Pretrial Proceedings

OSI filed a complaint against Dr. Schlein in May 2005, seeking declaratory relief, reformation of contract, and unjust enrichment. OSI alleged that it had no further obligation to Dr. Schlein under the 1992 Agreement, assuming it ever had one. To the extent the agreement was ever enforceable, it was terminable at the will of either party and that OSI had "effectively terminated" the agreement. OSI also claimed the agreement was void or voidable for lack of consideration.

Dr. Schlein answered the complaint and filed a cross-complaint against OSI, seeking damages for breach of contract and conversion. Dr. Schlein also asserted a claim for declaratory relief, seeking a determination that the 1992 Agreement required OSI to continue paying royalties for the sales of the shoulder positioner and pad sets. His amended cross-complaint alleged that OSI had violated Civil Code[7] section 3344, by using his name in conjunction with its marketing and sales of the shoulder positioner and pad set. In support of this claim, Dr. Schlein alleged that he gave OSI permission to use his name to market the Schlein Shoulder Positioner on the condition that OSI satisfied its obligations under the 1992 Agreement.

### C.  Trial

A jury trial commenced on March 20, 2008. Throughout the trial, evidence was presented regarding the difference between damages and profits. Also, during argument, counsel for both parties discussed the difference between an award of damages and an award of profits.

The court instructed the jury as to the differences between contract and tort damages. The court also instructed the jury with CACI No. 361, explaining that Dr. Schlein could not be awarded duplicative damages: "Dr. Schlein has made claims against [OSI] for breach of contract, conversion and misappropriation. . . . [I]f you decide, by way of example, that Dr. Schlein is entitled to recover royalties on one of his claims, he cannot recover those same royalties on another claim but may, if you so decide, recover non-royalty damages on other claims where permitted."

---

[7] All further undesignated statutory references are to the Civil Code.

The jury was also instructed with CACI No. 1821 regarding damages under section 3344, and advised that the "specific items of damages" claimed by Dr. Schlein were harm to reputation and loss of standing in the community and the commercial value of his name. CACI No. 1821 further instructed the jury that: "In addition, Dr. Schlein may recover any profits that [OSI] received from the use of Dr. Schlein's name." In establishing the amount of profits, the jury was instructed to "[d]etermine the gross, or total, revenue that [OSI] received" from the use of Dr. Schlein's name; to "[d]etermine the expenses that [OSI] had in obtaining the gross revenue"; and to "[d]educt [OSI's] expenses from the gross revenue." The jury was also instructed that Dr. Schlein was required to prove the amount of gross revenue and OSI was required to prove the amount of the expenses.

### D. Special Verdict and Judgment

The jury returned a special verdict finding, among other things, that:

(1) Dr. Schlein and OSI entered into a contract that required OSI to pay royalties to Dr. Schlein "for the sale of any shoulder positioning device and disposable pad set";

(2) OSI failed to pay royalties to Dr. Schlein;

(3) Dr. Schlein was harmed by the failure to pay royalties;

(4) Dr. Schlein's "damages" were $616,043;

(5) OSI used Dr. Schlein's name on its merchandise or to advertise or sell its products or services during the period from January 1, 2005, to July 31, 2005;

(6) Dr. Schlein's consent to use his name was dependent on OSI's payment of royalties to Dr. Schlein;

(7) OSI's use of Dr. Schlein's name was directly connected to OSI's commercial purpose;

(8) Dr. Schlein was harmed by OSI's wrongful use of his name;

(9) OSI's conduct was a substantial factor in causing harm to Dr. Schlein;

(10) Dr. Schlein suffered in the amount of $750; and

(11) OSI earned $1.22 million in profits that were attributable to the use of Dr. Schlein's name during the period from January 1, 2005, to July 31, 2005.

In the final section of the special verdict form entitled **"Total Amount Awarded,"** the jury was asked the following question: "If you awarded damages to Dr. Schlein in any of the above claims, state the total amount of damages awarded for all causes of action." In the space provided for the total, the jury inserted the amount of $616,793.

In the second phase of the trial regarding the parties' declaratory relief claims, the court found that OSI "has a continuing duty to pay royalties for the Schlein Shoulder Positioner (and related disposal pads) for so long as OSI continues to use Dr. Schlein's name and/or market a substantially similar product utilizing his contributions." In so ruling, the trial court stated that "[t]he same evidence which resulted in a jury verdict on the breach of contract claims leads to an equivalent conclusion on the declaratory relief claims."

The trial court further found that Dr. Schlein was not entitled to the $1.22 million profit identified by the jury in the special verdict, and entered a judgment awarding Dr. Schlein $616,793.

E. *Motions for Judgment Notwithstanding the Verdict*

OSI moved for judgment notwithstanding the verdict on the misappropriation claim, arguing among other things that this should have never gone to the jury, as it was an improper effort to "[t]ortify" a straightforward breach of contract claim, and that the verdict was not supported by substantial evidence because there was no evidence regarding a lack of consent.

Dr. Schlein also moved for partial judgment notwithstanding the verdict solely as to the issue of the exclusion of the $1.22 million in profits.

The trial court denied both motions.

F. *Motion for Attorney Fees and Costs*

The trial court awarded Dr. Schlein costs and also found him to be the prevailing party under section 3344 and awarded him $320,000 in attorney fees.

## II. CONTENTIONS

Dr. Schlein contends in his appeal that the trial court erred in excluding the profits earned by OSI that the jury found were attributable to OSI's use of his name.

OSI contends in its appeal that (1) the trial court erred in allowing the jury to interpret the 1992 Agreement; (2) the jury's finding that OSI breached the 1992 Agreement is inconsistent with the plain language of the contract and contrary to the extrinsic evidence establishing that OSI was required to pay royalties to Dr. Schlein only on sales of the Schlein Shoulder Positioner; (3) in the equitable phase of trial, the court erroneously declared the rights and obligations under the 1992 Agreement as requiring OSI to pay royalties on the sales of products other than the Schlein Shoulder Positioner; (4) the evidence does not support the jury's finding that OSI violated section 3344 by misappropriating Dr. Schlein's name; (5) the jury's finding that OSI both breached the 1992 Agreement and misappropriated Dr. Schlein's name is not supported by law; and (6) the trial court erred in awarding attorney fees to Dr. Schlein, and to the extent the award was proper, the amount was unreasonable.

## III. DISCUSSION

### A. Dr. Schlein's Appeal (No. A126374)

In his appeal, Dr. Schlein argues that the trial court erroneously interpreted the special verdict by excluding the profits that were clearly awarded by the jury. We agree.

#### 1. Background

The jury returned a special verdict finding, among other things, in favor of Dr. Schlein on his breach of contract and misappropriation claims. The special verdict contained five sections, which posed various questions. In response to question 4 in section one of the special verdict, regarding Dr. Schlein's breach of contract claims, the jury found that Dr. Schlein was damaged in the amount $616,043. In section four of the special verdict, pertaining to Dr. Schlein's misappropriation claims under section 3344, the jury was asked in question 6: "What, if any, actual damages did Dr. Schlein suffer as a result of the wrongful use of his name? [¶] a. Insert the greater of the actual damages suffered by Dr. Schlein or $750 . . . ." The jury inserted $750 in the space provided. Then, in question 7, the jury was asked: "What profit did OSI earn, if any, attributable to the use of Dr. Schlein's name during the period from January 1, 2005 to July 31, 2005?" In the space provided, the jury wrote $1.22 million.

The final section of the special verdict form was called "Section Five— Total Amount Awarded," and it provided as follows: "If you awarded damages to Dr. Schlein in any of the above claims, state the total amount of damages awarded for all causes [of] action." The jury wrote "$616,793.00" in the space provided.

OSI argued that the jury's insertion of $616,793 in section five of the special verdict meant that Dr. Schlein was not entitled to the profits. According to OSI, the jury simply inserted $1.22 million in response to question 7 of section four—the section pertaining to Dr. Schlein's misappropriation claims—"because there was no instruction suggesting [that] they could skip the question." Alternately, OSI argued that the jury declined to award the profits in the "total amount" awarded because it already had taken the profits into consideration in calculating the damages.

Dr. Schlein countered that the heading of the final section of the special verdict form (total amount awarded) was " 'unfortunate,' "[8] and that the sum denoted in response should be read as referring only to the damages awarded ($616,793) and not as excluding the $1.22 million in profits.

In finding that Dr. Schlein was not entitled to the profits identified by the jury in the special verdict, the trial court did not provide the basis for its reasoning. Rather, it merely incorporated by reference OSI's brief regarding section 3344, which the court found was more persuasive than the position advanced by Dr. Schlein.

### 2. *The Trial Court Improperly Interpreted the Special Verdict*

■ When no objection is made that a special verdict is ambiguous or incomplete before the jury is discharged, "it falls to 'the trial judge to interpret the verdict from its language considered in connection with the pleadings, evidence and instructions.' [Citations.] Where the trial judge does not interpret the verdict or interprets it erroneously, an appellate court will interpret the verdict if it is possible to give a correct interpretation. [Citations.] If the verdict is hopelessly ambiguous, a reversal is required, although retrial may be limited to the issue of damages. [Citations.]"[9] (*Woodcock v. Fontana Scaffolding & Equip. Co.* (1968) 69 Cal.2d 452, 456–457 [72 Cal.Rptr. 217, 445 P.2d 881].)

However, "[a] court reviewing a special verdict does not infer findings in favor of the prevailing party [citation], and there is no presumption in favor of upholding a special verdict when the inconsistency is between two questions in a special verdict." (*Zagami, Inc. v. James A. Crone, Inc.* (2008) 160 Cal.App.4th 1083, 1092 [74 Cal.Rptr.3d 235]; see also *City of San*

---

[8] It appears that this section was added to the special verdict form at the insistence of the trial court, with the intended goal of providing a math check.

[9] Below, neither party sought clarification of the special verdict before the jury was discharged. Indeed, each side maintained that the special verdict was not ambiguous—OSI taking the position that profits were not awarded and Dr. Schlein taking the position that they were.

*Diego v. D.R. Horton San Diego Holding Co., Inc.* (2005) 126 Cal.App.4th 668, 678 [24 Cal.Rptr.3d 338] [" 'special verdict's correctness must be analyzed as a matter of law' "].)

Taken as a whole and in light of the parties' claims, the special verdict shows the jury found that OSI breached the 1992 Agreement and misappropriated Dr. Schlein's name. Consistent with these findings, the jury found that Dr. Schlein was damaged by the breach in the amount of $616,043 and that he was harmed by the misappropriation in the amount of $750. Thus, it awarded damages to Dr. Schlein in the amount of $616,793. Regarding the amount of profits OSI earned that were attributable to the use of Dr. Schlein's name, the jury found for Dr. Schlein in the amount of $1.22 million.

The record belies OSI's suggestions that the jury may have purposely failed to include the profits in the total amount awarded because it had taken the profits into consideration in calculating damages. In calculating the profit amount, Dr. Schlein's expert excluded the royalties OSI should have paid to Dr. Schlein ($122,730) under the contract for the seven-month period from January 1, 2005, to July 31, 2005, from OSI gross revenues for that period ($2,033,333) and also took into consideration a 60 percent profit margin, to arrive at a net figure of $1.22 million.

The jury awarded the exact figure calculated by Dr. Schlein's expert. Where, as here, a jury's verdict precisely matches an expert's testimony, logic and common sense tells us that the jury accepted the expert's analysis and calculations. (*Bardis v. Oates* (2004) 119 Cal.App.4th 1, 17 [14 Cal.Rptr.3d 89] [jury's special verdict matched exhibit to the penny]; see also *Fassberg Construction Co. v. Housing Authority of City of Los Angeles* (2007) 152 Cal.App.4th 720, 748 [60 Cal.Rptr.3d 375] [jury's award of precise amount stated by expert strong indication jury accepted expert's testimony on that point]; *Foss v. Anthony Industries* (1983) 139 Cal.App.3d 794, 801 [189 Cal.Rptr. 31] [fact that jury awarded exact amount testified by expert showed jury used same underlying assumptions as expert].)

Moreover, it is clear that had it been so inclined, the jury could have omitted a profits finding from the verdict. Specifically, the jury was asked: "What profit did OSI earn, *if any*, attributable to the use of Dr. Schlein's name . . . ?" (Italics added.) The jury could have easily inserted a zero in the space provided. Likewise, the jury could have simply left it blank, which we recognize would have raised another ambiguity problem; fortunately we do not have to address that ambiguity or otherwise choose between inconsistent answers. This is not a case where the jury valued a skiploader at both $15,500 and $30,000 (see *Zagami, Inc. v. James A. Crone, Inc., supra,* 160 Cal.App.4th at p. 1093), or valued land at both $445,000 and $850,000 per

acre (see *City of San Diego v. D.R. Horton San Diego Holding Co., Inc., supra,* 126 Cal.App.4th at p. 683), or found a car was both negligently designed and had no design defect (*Lambert v. General Motors* (1998) 67 Cal.App.4th 1179, 1182 [79 Cal.Rptr.2d 657]). Rather, the issue is whether Dr. Schlein was entitled to the $1.22 million in profits earned by OSI's use of his name. The answer to this question requires a review of the applicable law.

■ California law has long recognized "the right to profit from the commercial value of one's identity as an aspect of the right of publicity." (*Gionfriddo v. Major League Baseball* (2001) 94 Cal.App.4th 400, 409 [114 Cal.Rptr.2d 307]; see also *Stewart v. Rolling Stone LLC* (2010) 181 Cal.App.4th 664, 679 [105 Cal.Rptr.3d 98]; *Downing v. Abercrombie & Fitch* (9th Cir. 2001) 265 F.3d 994, 1001 (*Downing*).) "What may have originated as a concern for the right to be left alone has become a tool to control the commercial use and, thus, protect the economic value of one's name . . . ." (*KNB Enterprises v. Matthews* (2000) 78 Cal.App.4th 362, 366 [92 Cal.Rptr.2d 713].) There are two vehicles a plaintiff can use to protect this right: a common law cause of action for commercial misappropriation and a section 3344 claim. (*Downing, supra,* 265 F.3d at p. 1001.) To prove the common law cause of action, the plaintiff must establish: " '(1) the defendant's use of the plaintiff's identity; (2) the appropriation of plaintiff's name or likeness to defendant's advantage, commercially or otherwise; (3) lack of consent; and (4) resulting injury.' [Citation.]" (*Ibid.*) To prove the statutory remedy, a plaintiff must present evidence of "all the elements of the common law cause of action" and must also prove "a knowing use by the defendant as well as a direct connection between the alleged use and the commercial purpose." (*Ibid.*)

Section 3344 governs the statutory remedy. Section 3344, subdivision (a) (section 3344(a)) provides in relevant part that "in any action brought under this section, the person who violated the section shall be liable to the injured party or parties in an amount equal to the greater of seven hundred fifty dollars ($750) or the actual damages suffered by him or her as a result of the unauthorized use, and any profits from the unauthorized use that are attributable to the use and are not taken into account in computing the actual damages."

Dr. Schlein asserts that the phrase "and any profits from the unauthorized use that are attributable to the use and are not taken into account in computing the actual damages" applies both to the minimum statutory damages of $750 or to actual damages. The interpretation of section 3344(a), and its phrase "and any profits from the unauthorized use that are attributable to the use and are not taken into account in computing the actual damages," is a legal issue subject to our de novo review. (*Arce v. Kaiser Foundation Health Plan, Inc.* (2010) 181 Cal.App.4th 471, 500 [104 Cal.Rptr.3d 545].)

In arguing that Dr. Schlein was not entitled to the profits specified by the jury, OSI claimed the statute should be interpreted to exclude any award of profit where actual damages are not awarded. According to OSI, the section 3344(a) phrase "and any profits from the unauthorized use that are attributable to the use and are not taken into account in computing the actual damages" should be applied only to the phrase regarding "actual damages suffered by him or her as a result of the unauthorized use," and not to the phrase regarding the $750 award.

In construing section 3344(a), "we turn first to the language of the statute, giving the words their ordinary meaning. [Citations.] We must follow the statute's plain meaning, if such appears, unless doing so would lead to absurd results the Legislature could not have intended. [Citations.] If our examination of the statutory language leaves doubt about its meaning, we may consult other evidence of the Legislature's intent, such as the history and background of the measure. [Citations.]" (*People v. Birkett* (1999) 21 Cal.4th 226, 231–232 [87 Cal.Rptr.2d 205, 980 P.2d 912].)

OSI's position is essentially based on the " 'last antecedent' " rule of statutory construction, which generally provides that " 'qualifying words, phrases and clauses are to be applied to the words or phrases immediately preceding and are not to be construed as extending to or including others more remote.' " (*White v. County of Sacramento* (1982) 31 Cal.3d 676, 680 [183 Cal.Rptr. 520, 646 P.2d 191].) However, "[e]vidence that a qualifying phrase is supposed to apply to all antecedents instead of only to the immediately preceding one may be found in the fact that it is separated from the antecedents by a comma." (*Ibid.*) Here, the phrase referencing profits is set off by a comma, suggesting that it applies both to the minimum statutory damages and to actual damages.

What is perhaps the most damaging to Dr. Schlein's position is that the qualifying phrase refers to profits that are "not taken into account in computing the actual damages." (§ 3344(a).) The reference to profits in connection with the computation of actual damages lends some credence to OSI's interpretation of section 3344(a) that profits are not applicable when the minimum statutory damages are awarded. Although, grammatically speaking, such an interpretation would be plausible, we are not persuaded. " 'The rules of grammar and canons of construction are but tools, "guides to help courts determine likely legislative intent. [Citations.] And that intent is critical. Those who write statutes seek to solve human problems. Fidelity to their aims requires us to approach an interpretive problem not as if it were a purely logical game, like a Rubik's Cube, but as an effort to divine the human intent that underlies the statute." ' (*Burris v. Superior Court* (2005) 34 Cal.4th

1012, 1017 [22 Cal.Rptr.3d 876, 103 P.3d 276].)" (*Costco Wholesale Corp. v. Workers' Comp. Appeals Bd.* (2007) 151 Cal.App.4th 148, 153–154 [59 Cal.Rptr.3d 611].)

The human problem to be solved by section 3344(a) is the provision of a remedy to a person whose name, among other things, is misappropriated. That statute provides for damages (statutory or actual), as well as profits. We recognize there is some ambiguity regarding whether the minimum measure of damages is $750 plus profits or just $750. Accordingly, we look to the legislative history for clarification. (*People v. Birkett, supra,* 21 Cal.4th at pp. 231–232.)

In *Miller v. Collectors Universe, Inc.* (2008) 159 Cal.App.4th 988 [72 Cal.Rptr.3d 194] (*Miller*), the court traced the history of section 3344 in order to determine, inter alia, what the minimum statutory damages (i.e., the $750 award) set forth in subdivision (a) were meant to remedy (*Miller, supra,* at p. 1002). According to *Miller,* "[t]he statute's legislative history reveals section 3344(a) was intended to fill 'a gap which exist[ed] in the common law tort of invasion of privacy' as applied to noncelebrity plaintiffs whose names lacked 'commercial value on the open market.' [Citation.] Unlike an entertainment or sports star, noncelebrity plaintiffs often could not prove damages under the common law; therefore, section 3344(a) as originally enacted in 1971 'established a concrete remedy for the little man with a minimum . . . payment,' 'a simple, civil remedy for the injured individual.' [Citation.]" (*Miller, supra,* 159 Cal.App.4th at p. 1002, fn. omitted.) Thus, the *Miller* court confirmed that section 3344 was enacted to provide a "practical remedy for a noncelebrity plaintiff whose damages are difficult to prove . . . ." (*Miller, supra,* at p. 1002.)

We can conceive no rational basis for the Legislature to limit the $750 as an alternative to all other damages, including profits. If someone profits from the unauthorized use of another's name, it makes little sense to preclude the injured party from recouping those profits because he or she is entitled to statutory damages as opposed to actual damages. Similar reasoning appears to be reflected in the civil jury instructions for damages under section 3344, which provide: "If [name of plaintiff] has not proved the above damages, or has proved an amount of damages less than $750, then you must award [him/her] $750. [¶] In addition, [name of plaintiff] may recover any profits that [name of defendant] received from the use of [name of plaintiff]'s [name . . .] [that have not already been taken into account in computing the above damages]." (CACI No. 1821, italics omitted.)

An interpretation of section 3344(a) that limits the minimum measure of damages to $750 as an alternative to all other damages, including profits,

would be contrary to the spirit of the statute and the long-recognized right to control the commercial use, and thus protect the economic value, of one's name. (*Gionfriddo v. Major League Baseball, supra,* 94 Cal.App.4th at p. 409; see also *Stewart v. Rolling Stone LLC, supra,* 181 Cal.App.4th at p. 679; *KNB Enterprises v. Matthews, supra,* 78 Cal.App.4th at p. 366.) Section 3344(a) was enacted to provide "a practical remedy for a noncelebrity plaintiff whose damages are difficult to prove . . . ." (*Miller, supra,* 159 Cal.App.4th at p. 1002.) The purpose of the statute is not served by preventing an injured plaintiff from recouping the profits attributable to the unauthorized use of his or her name where actual damages are not awarded.

■ We hold that under section 3344(a), an injured party may recover either the amount of damages specified in the statute or actual damages, whichever is greater, as well as profits from the unauthorized use.

Given the above analysis, it clearly appears that the trial court's interpretation of the special verdict is erroneous. We find no factual or legal support for excluding the $1.22 million in profits from the jury's special verdict. "Whenever an appellate court may make a final determination of the rights of the parties from the record on appeal, it may, in order to avoid subjecting the parties to any further delay or expense, modify the judgment and affirm it, rather than remand for a new determination. [Citations.]" (*Sagadin v. Ripper* (1985) 175 Cal.App.3d 1141, 1170 [221 Cal.Rptr. 675]; see also Code Civ. Proc., § 43.) The record is sufficiently definite in this case to do so.

Accordingly, we modify the judgment so that it accurately reflects the jury's special verdict, namely its finding that Dr. Schlein was entitled to $1.22 million as a result of OSI's unauthorized use of his name, and affirm the judgment as so modified.

B., C.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## IV.  DISPOSITION

The judgment is modified to conform with the jury's special verdict, namely its finding that Dr. Schlein was entitled to $1.22 million, representing

---

*See footnote, *ante*, page 529.

OSI's profits from the unauthorized use of Dr. Schlein's name. As so modified, the judgment is affirmed. Dr. Schlein is entitled to his costs on appeal.

Ruvolo, P. J., and Sepulveda, J., concurred.

A petition for a rehearing was denied January 23, 2012, and the petition of respondent Orthopedic Systems, Inc., for review by the Supreme Court was denied March 14, 2012, S199952.