Filed 9/2/16

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| LOCAL TV, LLC et. al, | B271883 |
| Petitioners, | (Los Angeles County Super. Ct. No. BC500792) |
| v. | |
| SUPERIOR COURT OF LOS ANGELES COUNTY, | |
| Respondent; | |
| KURT KNUTSSON et. al, | |
| Real Parties in Interest. | |

ORIGINAL PROCEEDINGS; petition for writ of mandate. Gregory W. Alarcon, Judge. Petition granted.

Leopold, Petrich & Smith, Vincent Cox and Elizabeth L. Schilken, for Petitioners.

Judith Salkow Shapiro, and Allred Maroko Goldberg, Nathan Goldberg and John Steven West, for Real Parties in Interest.

## INTRODUCTION

Kurt Knutsson, a technology reporter who created "Kurt the CyberGuy" video segments for use on television news programs and station websites, brought the lawsuit that underlies this petition for writ of mandate (petition). Pursuant to a written agreement that Knutsson and his company, Woojivas, Inc. (plaintiffs) entered into with Los Angeles television station KTLA, Inc. (KTLA), website material Knutsson created was distributed to the websites of certain television stations in other cities, including those of stations owned and operated by Local TV, LLC, and Local TV Finance, LLC (LTV).

We address here the question of whether, for purposes of the common law tort of misappropriation of name and likeness, plaintiffs consented to LTV's use of the CyberGuy material, including placing links to it on webpages along with links to material created by a reporter who was hired following the termination of Knutsson's contract. We hold that based on the broad consent in the agreement, plaintiffs cannot prove lack of consent to the manner in which LTV used the CyberGuy material. This determination requires that plaintiffs also cannot prevail on the two other causes of action at issue. We therefore conclude the trial court's ruling denying summary judgment to LTV was in error and grant the petition.

## FACTS AND PROCEDURE

### I. The Agreement Between Plaintiffs and KTLA

Knutsson was a technology reporter at KTLA for 15 years, between 1996 and 2011. In 2008, he and his company entered into a five-year contract with KTLA (the Agreement) that KTLA could terminate at the end of three years.[1] In the Agreement, Knutsson contracted to work, using his "CyberGuy" brand, as an on-air reporter on

---

[1] We treat the Agreement as between KTLA and both plaintiffs. The Agreement itself was between Woojivas, Inc. and KTLA, but Knutsson simultaneously provided a letter approving of the Agreement and agreeing to offer his services under it and be bound by it.

2

consumer technology and computers, as well as a creator of content on those subjects for KTLA's website, such as video segments and product reviews.

Under the Agreement, for Knutsson's work, KTLA was to pay an annual salary that began at $325,000 and increased by $25,000 each year, and provide other benefits. In return, the Agreement gave KTLA complete ownership over, and the virtually unfettered right to use, Knutsson's work. That is, the Agreement made KTLA the "exclusive, perpetual, and unencumbered owner forever" of all the material that Knutsson produced for the station, with "all rights with respect thereto for any and all purposes whatsover." It further gave KTLA "the unlimited right . . . perpetually throughout the world in any manner and by any method or means and in any and all media . . . to exploit the programs, recordings, and material or any portions thereof." The Agreement explained the breadth of KTLA's ability to use the material: "Exploitation may include unlimited uses in all forms of reproduction, transmission, exhibition, display, and presentation, including television, theaters, rental libraries, devices marketed for the home . . . books, periodicals, wireless, internet uses and all other types of exploitation now existing or hereafter devised."

The Agreement also allowed KTLA to present Knutsson's work in virtually any way it wished, including combining it with other material. Specifically, KTLA could "cut, edit, add to, subtract from, arrange, rearrange, or otherwise modify [Knutsson's work] or take excerpts therefrom or combine all or any portion thereof with the material of others, and [plaintiffs] waive[d] all rights to approve or object thereto."

The Agreement allowed KTLA to provide CyberGuy material to other television stations. One provision stated that Knutsson would not only provide reports for KTLA newscasts, but also make "live 'CyberGuy' segments for other television stations designated by KTLA." In another provision, KTLA agreed not only to "prominently feature" the material on its website, but also to "distribute the material for website use by other stations owned or managed by KTLA's corporate parent, Tribune Broadcasting Company [(Tribune Broadcasting)]. KTLA intend[ed] also to exploit this material through media platforms other than the Tribune Broadcasting stations' websites." A

3

provision stated that Knutsson's website content would "be distributed under [his company's] 'CyberGuy' brand." KTLA additionally agreed that Knutsson could create a link on his personal website to both KTLA's home page and "the home pages of other stations on which [Knutsson's] materials are distributed under this Agreement." Finally, KTLA agreed to allow plaintiffs to continue to distribute materials to television stations in two particular cities, with the caveat that if Tribune Broadcasting acquired or managed a television station in either city, "the Tribune station will have the exclusive right thereafter to air the 'CyberGuy' material in the affected market."[2]

Two provisions of the Agreement placed some restrictions on KTLA's ownership and use rights. First, a provision authorized KTLA to use Knutsson's name and likeness in advertising and publicizing KTLA and the CyberGuy material, but not as an "endorsement." We discuss that provision in greater detail in the Discussion section below. Second, the transfer of ownership to KTLA came with the restriction that "[n]othing in this Agreement gives KTLA ownership rights in the CyberGuy designation used by [Knutsson]." We also discuss that provision below.

## II. LTV's Agreement with Tribune Company

LTV, which owned and operated approximately 21 television stations in various cities and their associated websites, entered into a Management Services Agreement (MSA) with Tribune Company, which was the parent of Tribune Broadcasting, KTLA's corporate parent. The MSA provided that Tribune Company or its subsidiaries would host the LTV stations' websites on its "Tribune Technology Platform." In the MSA, Tribune Company represented that it had agreements with third-party vendors that

---

[2] In opposing LTV's summary judgment motion, Knutsson acknowledged that he consented to KTLA's distribution of the CyberGuy material to other stations. In a declaration, Knutsson stated that he was "aware while the 2008 Agreement was in place that [his] CyberGuy material was being broadcast on Tribune [Broadcasting] stations and on other stations such as Superstation WGN. Since one of [his] goals was to maximize the reach of [his] CyberGuy broadcasts under the terms of the 2008 Agreement to as many markets as possible, [he] saw distribution of CyberGuy material to other stations during the life of the 2008 Agreement as pursuant to the agreement with KTLA."

4

allowed LTV to access their products and services, "strictly limited to the rights and obligations contained within such third-party vendor agreements." These included agreements for, among other content, weather information, news articles from a wire service, photos, sports scores and statistics, and advertising. Tribune Company agreed to indemnify LTV for losses arising out of the breach of the third party vendor agreements by Tribune Company.

Pursuant to the MSA, LTV's websites began featuring Knutsson's CyberGuy video segments, product reviews, and photos. This material was "pushed" onto the LTV websites by the company that Tribune Company used to operate the Tribune Technology Platform rather than LTV requesting or managing the material.

## III. KTLA's Termination of Knutsson and Subsequent Events

KTLA terminated its contract with plaintiffs as of March 31, 2011. Afterward, KTLA employed a new technology reporter, Rich DeMuro, and Tribune Company "pushed" content he created onto the LTV websites. Meanwhile, the CyberGuy material remained on LTV websites for several months, with its format apparently unchanged, except that material from DeMuro also was being pushed by Tribune Company onto web pages with it.[3] Between November 2011 and mid-April 2012, LTV began transitioning its 21 station websites off the Tribune Technology Platform to a different host. When a station's website was transferred, it no longer contained the content that Tribune Company was providing under the MSA, so it no longer had CyberGuy content.

On November 30, 2011, plaintiffs' counsel wrote KTLA a letter complaining of violations of Knutsson's rights, including his right to publicity. On January 23, 2012, a Tribune Broadcasting vice president sent an email to an LTV vice president stating that he had received a request to "purge any remnants of Kurt the CyberGuy" from LTV sites.

---

[3] With their opposition to LTV's summary judgment motion, plaintiffs submitted exhibits of web pages from four LTV websites showing his material on them along with DeMuro's work as of August 2011, and exhibits of web pages from two LTV websites showing his material on them as of early- and mid-January 2012.

He asked if LTV wanted him to remove certain index page and Uniform Resource Locator (URL) material while he was doing that.[4]  The LTV vice president responded affirmatively.

Some of the CyberGuy content apparently was not removed from the website of one LTV station.  On March 31, 2012, LTV received a legal notice from Knutsson that he objected to the presence of his content on their websites.  The next day, the LTV vice president determined that 19 of the 21 LTV stations had moved off of the Tribune Technology Platform, so they did not contain CyberGuy material.  One of the two remaining station websites had no CyberGuy material.  The final website, KFOR.com, had "no Kurt Knutsson or Cyber[G]uy content on the KFOR.com site that could be reached by links on the main page or any page linked to by the main page."  There were, however, some "obsolete" pages that were not being promoted or linked to, but which referenced Knutsson or CyberGuy, and the LTV vice president deleted those.

**IV.  The Complaint and LTV's Summary Judgment Motion**

Plaintiffs filed their complaint against KTLA, LTV, and several television stations operated by Tribune Broadcasting.  Against KTLA, which is not a party to this writ proceeding, plaintiffs alleged age discrimination and breach of contract.  Against all defendants, plaintiffs alleged common law misappropriation of name and likeness; violation of Civil Code section 3344, which provides a similar misappropriation cause of action; and unfair business practices (Bus. & Prof. Code, § 17200 et seq.).

The trial court denied LTV's motion for summary judgment on the claims against it.  LTV filed the instant petition seeking a determination that plaintiffs' claims fail as a matter of law.  We issued an alternative writ, following which the trial court did not change its order.

---

[4]     To use the technical terms, the Tribune Broadcasting vice president asked if he should have the "section fronts and slugs" removed.  A "slug" is the headline of an article used in web URL, essentially the address for a web page on the internet.  A "section front" is a web page that contains links to a group of slugs in a list for easy accessibility.

**DISCUSSION**

## I. Propriety of Writ Relief and Standard of Review

We may grant writ relief for the erroneous denial of a motion for summary judgment pursuant to Code of Civil Procedure section 437c, subdivision (m)(1). While writ relief is extraordinary because a party often has an adequate remedy through filing a post-judgment appeal, "[t]he adequacy of an appellate remedy depends on the circumstances of the case, thereby necessarily vesting a large measure of discretion in the appellate court to grant or deny a writ." (*Noe v. Superior Court* (2015) 237 Cal.App.4th 316, 323.) "Where the trial court's denial of a motion for summary judgment will result in a trial on non actionable claims, a writ of mandate will issue." (*Prudential Ins. Co. of Am. v. Superior Court* (2002) 98 Cal.App.4th 585, 594.) We independently review a trial court's ruling on a summary judgment motion. (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 860.)

## II. Common Law Misappropriation of Name and Likeness

The tort of misappropriation of name or likeness originated as a branch of the common law right of privacy. (*Eastwood v. Superior Court* (1983) 149 Cal.App.3d 409, 416 (*Eastwood*).) To prove a misappropriation, a plaintiff must show "(1) the defendant's use of the plaintiff's identity; (2) the appropriation of plaintiff's name or likeness to defendant's advantage, commercially or otherwise; (3) lack of consent; and (4) resulting injury." (*Id.* at p. 417.)

In its petition, LTV argues that plaintiffs cannot demonstrate a lack of consent, due to their consent to the use of the CyberGuy material in the Agreement. LTV's knowledge of the consent is immaterial to the common law inquiry. (*Fairfield v. American Photocopy Equipment Co.* (1955) 138 Cal.App.2d 82, 87; see *Eastwood*, *supra*, 149 Cal.App.3d at p. 417, fn. 6; Rest.3d Unfair Competition, § 46, com. e, p. 542 ["a mistake regarding the plaintiff's consent is not a defense"].) Thus, even though LTV, as the licensee of Tribune Company, did not know the terms of the Agreement between

plaintiffs and KTLA and relied on Tribune Company to provide authorized material, the consent to LTV's use of the CyberGuy material is determined by the extent of plaintiffs' consent in the Agreement.

Consistent with these principles, in their return to the petition, plaintiffs agree that Tribune Company granted to LTV the rights that Tribune Company's subsidiary, KTLA, obtained in the Agreement. It thus is not in dispute that the language in the Agreement determines whether plaintiffs can show lack of consent. Consent to the use of a name or likeness is determined by traditional principles of contract interpretation. (See *Newton v. Thomason* (9th Cir. 1994) 22 F.3d 1455, 1461 [affirming summary judgment based on consent in letter]; Rest.3d Unfair Competition, § 46, reporter's notes, p. 543 ["The scope of consent is determined according to the general principles of contract interpretation"].)

Plaintiffs further acknowledge that they are not challenging "KTLA's ownership of [Knutsson's] works" or "LTV's use thereof." These concessions are warranted because, under the Agreement, KTLA was the "exclusive, perpetual, and unencumbered owner forever" of the work product Knutsson created while working for KTLA, and KTLA had the right to "distribute the material for website use by other [Tribune Broadcasting] stations [and] to exploit this material through media platforms other than the Tribune Broadcasting stations' websites."

Consequently, plaintiffs' argument is limited to claiming that they did not consent to the particular manner in which LTV displayed the material on its stations' websites. Plaintiffs focus on LTV's use of a heading on its web page entitled "Kurt the CyberGuy" as well as his picture. These items remained on the website after Knutsson's employment was terminated, and links to his CyberGuy material remained on LTV websites, along with links on the same webpage to material from DeMuro, the reporter who succeeded him. Plaintiffs' central argument is that, through this use, LTV exceeded plaintiffs' consent because it violated the provision of the Agreement that allowed KTLA to use his material in "advertising and publicizing KTLA . . . and the [CyberGuy] website material" but not as an "endorsement" (the advertising provision). The advertising provision states:

"[Knutsson's] name, sobriquet (including 'CyberGuy'), biography, picture, portrait, caricature, voice and likeness may be used in advertising and publicizing KTLA and the program and website material produced under this Agreement, but not as an endorsement or testimonial."**[5]**

The advertising provision reflects principles of publicity law that typically arise when a publication is advertising itself. Advertising using a publication's content does not violate the right to publicity of a person appearing in the advertising, unless the advertisement implies that the person is endorsing the publication. (*E.g.*, *Cher v. Forum Int'l, Ltd.* (9th Cir. 1982) 692 F.2d 634, 639 (*Cher*) ["advertising to promote a news medium . . . is not actionable under an appropriation of publicity theory so long as the advertising does not falsely claim that the public figure endorses that news medium"]; *Montana v. San Jose Mercury News, Inc.* (1995) 34 Cal.App.4th 790, 797 [newspaper's posters reproducing its pictures of football quarterback were advertisements that did not misappropriate his image where "they did not state or imply that [the quarterback] endorsed the newspaper"]; Rest.3d Unfair Competition, § 47, reporter's notes, p. 557 [providing general rule that "advertising that is incidental" to news reporting is not actionable, but stating that an "exception is sometimes recognized in connection with otherwise permissible advertising for lawful uses of another's identity if the advertisement falsely suggests an endorsement or is otherwise deceptive"].)

The advertising provision does not apply to the facts alleged by plaintiffs. Here, the use of Knutsson's name and picture was not for "advertising and publicizing" the stations or their content, any more than a traditional newspaper headline and photo of a columnist constitutes advertising or publicity for the newspaper. Importantly, LTV's use of Knutsson's name and photo occurred only on the LTV sites, not in a communication

---

**[5]** We treat the phrase "endorsement or testimonial" as simply "endorsement" for ease of reference. Generally, an "endorsement" is used when the speaker is a celebrity and "testimonial" is used when the speaker is a consumer. (See, e.g., 16 C.F.R. § 255.0 ["treat[ing] endorsements and testimonials identically in the context of its enforcement of the Federal Trade Commission Act . . . . The term endorsements is therefore generally used hereinafter to cover both terms and situations"].)

9

sent or shown elsewhere.  Using Knutsson's name and picture on the LTV site served the purpose of identifying his material for readers.  That use falls under the consent that plaintiffs gave for LTV and its licensee stations to use the CyberGuy material.  In fact, separate from the advertising provision, the Agreement states that Knutsson's material "will be distributed under [his] 'Cyberguy' brand" and that KTLA's website will "prominently feature" his material.  These provisions, rather than the advertising provision, authorize the use of Knutsson's brand name and picture on the LTV websites.

We recognize that LTV's use of Knutsson's brand on its internet pages could serve a secondary purpose of "advertising or publicizing" LTV's stations by attracting consumers to the sites through their web searches.  Even if the advertising provision applied, however, it would demonstrate plaintiffs' consent to LTV's use of the identifying heading and picture.  Through the advertising provision, plaintiffs agreed that Knutsson's "name, sobriquet (including 'CyberGuy') [and] picture" may be used in advertising . . . ."  The use of a neutral heading and Knutsson's picture are covered by this language.  (See *Guglielmi v. Spelling-Goldberg Productions* (1979) 25 Cal.3d 860, 873 ["Since the use of [a celebrity's] name and likeness in the film was not an actionable infringement of [the celebrity's] right of publicity, the use of his identity in advertisements for the film is similarly not actionable"]; *Polydoros v. Twentieth Century Fox Film Corp.* (1997) 67 Cal.App.4th 318, 325 [same]; *Cher*, *supra*, 692 F.2d at p. 639 [advertisements not actionable where "merely an adjunct of the protected publication and promote[] only the protected publication"].)

Consequently, the material displayed on the LTV's sites–the CyberGuy material, which KTLA was the owner of "forever," and the identifying heading and photo–were themselves not a misappropriation of Knutsson's name or likeness.  KTLA owned the CyberGuy material and had the contractual right to display, distribute, and promote it.  Although plaintiffs argue that LTV was "using the CyberGuy brand to attract viewers and create positive associations in people[s'] mind[s] between [Knutsson] . . . and the LTV station[s] and website[s]," LTV had the right to use the material in this manner due to the Agreement.  Additionally, plaintiffs argue that the material was "posted on LTV's

10

technology web pages for an extended period after [Knutsson] ceased to broadcast on their stations or provide material for their websites." This is immaterial, as KTLA's ownership and distribution rights did not terminate with the end of his employment.

Plaintiffs further claim that the way that Knutsson's materials were arranged on some LTV web pages indicated that he "was endorsing their new technology reporter, Rich DeMuro." As the new DeMuro material was "pushed" onto LTV's websites by Tribune Company, links to that material appeared on the same pages with links to Knutsson's material. Plaintiffs argue that they did not consent to this use. This argument fails for two reasons.

First, plaintiffs expressly consented to allow KTLA (and therefore LTV) to present the CyberGuy material along with any other content. Under the Agreement, LTV could "arrange, rearrange, or otherwise modify [Knutsson's work] or take excerpts therefrom or combine all or any portion thereof with the material of others, and [plaintiffs] waive[d] all rights to approve or object thereto." This constitutes express consent to arranging materials on the website, the very conduct about which plaintiffs complain here.

Second, even absent the express consent just discussed, plaintiffs have not shown a lack of consent to combining the CyberGuy material, and its neutral heading, with other material on the same web page. As it is common for varied material, including links to unrelated articles and advertising, to appear on the same webpage on a news organization's website, displaying material in this manner is encompassed by plaintiffs' general consent for stations to use the material on their websites. On this record, it is speculation to suggest that a consumer would be confused by the proximity of the links on the webpages that Knutsson offered, and any such confusion is not an element of the misappropriation tort. (See *Newton v. Thomason*, *supra*, 22 F.3d at pp. 1461-63 [summary judgment on misappropriation tort upheld under California law where celebrity consented to the use of his name for a character on a television show; consumers' "likelihood of confusion" between celebrity and television character analyzed separately as element to be proven under federal trademark infringement cause of action].) In this regard, we note that any consumer confusion likely would be limited here because the

11

vast majority of the links to DeMuro material on the LTV websites had DeMuro's name in the description of the material accompanying the link, so a consumer would see, even before clicking the link, that it was created by DeMuro rather than by Knutsson.

We would agree that LTV *would* act outside the general consent given in the Agreement by using Knutsson's persona to endorse other material. LTV might do so, for instance, if it falsely stated that Knutsson endorsed a product or DeMuro. The combining of materials here, however, does not involve such deception and thus was not beyond plaintiffs' consent. (See *Cher*, *supra*, 692 F.2d at p. 638 [no liability against publication where the words it used to publicize a celebrity interview did not constitute a false claim that the celebrity endorsed the publication]; *Page v. Something Weird Video* (C.D. Cal. 1996) 960 F.Supp. 1438, 1445 [company that distributed home videocassettes could use celebrity's image from two movies "to advertise their entire line of video products so long as they did not falsely claim that [the celebrity] endorsed" the company].)

Finally, plaintiffs argue that LTV violated the contractual provision stating that "[n]othing in this Agreement gives KTLA ownership rights in the 'CyberGuy' designation used by [Knutsson]." Knutsson does not state how LTV acted in any way to indicate that it owned that designation. It merely used headings and banners with the CyberGuy designation in order to identify Knutsson's material, and the Agreement authorized it to distribute the material "under [his] 'Cyberguy' brand." Indeed, plaintiffs appear to have had no issue with LTV's doing this, so long as Knutsson was employed by KTLA. The rights of KTLA and its licensees to use the material under the Agreement, however, did not terminate with Knutsson's employment.

In fact, the few actions that LTV took were consistent with it *not* owning the CyberGuy designation. As LTV moved its websites off of the Tribune Technology Platform between November 2011 and April 2012, it did not keep the CyberGuy material. In January 2012, when a Tribune Broadcasting executive first told LTV he was going to "purge any remnants of Kurt the CyberGuy" from the sites still on the Tribune Technology Platform, an LTV executive confirmed that Tribune Broadcasting should remove the URLs and index pages related to that material as well. (See fn. 4, above.)

12

Finally, when on March 31, 2012, LTV received a legal notice from Knutsson, it immediately investigated and within a day removed the "obsolete" CyberGuy pages from the one station website that still displayed them.

Notably, the evidence demonstrates that LTV did not exercise the utmost rights that it was permitted under the Agreement. Some of Knutsson's complaints about the use of his name and photograph along with other content on the same page arose because LTV was not exploiting his material as much as it could. KTLA and LTV had the contractual right to continue to display the CyberGuy material "forever," so they could have kept all the CyberGuy material posted after Knutsson's termination. Yet Knutsson's works were being phased out as new material was "pushed" onto the LTV websites by Tribune Company, and/or because Knutsson had requested its removal. Further, Knutsson's work also was being completely removed from the LTV websites as LTV moved its stations' webpages off of the Tribune Technology Platform. As plaintiffs consented to LTV's keeping all of Knutsson's material on its website, combined with other material, but as LTV had no obligation to do so, it cannot exceed that consent by phasing out (or actively removing) a portion of the material during a transitional period to the complete elimination of the material.

For these reasons, plaintiffs cannot demonstrate lack of consent to LTV's use of the CyberGuy material, so summary judgment in favor of LTV was warranted on the common law misappropriation of name and likeness cause of action. Because we resolve this and the other causes of actions on this ground, we do not address LTV's arguments that its use of the CyberGuy material was protected by the First Amendment of the United States Constitution.

### III. Section 3344

Section 3344 provides a statutory cause of action for commercial misappropriation that complements, rather than codifies, the common law misappropriation cause of action. (*Eastwood*, *supra*, 149 Cal.App.3d at pp. 416-417 & fn. 6.) Under section 3344, a plaintiff must prove all the elements of the common law cause of action. (*Orthopedic*

13

*Systems, Inc. v. Schlein* (2011) 202 Cal.App.4th 529, 544 (*Orthopedic Systems*).)  The section 3344 cause of action therefore fails for the same reason as the common law cause of action–plaintiffs cannot prove lack of consent.

In addition to the common law elements, section 3344 requires "a knowing use by the defendant as well as a direct connection between the alleged use and the commercial purpose." (*Orthopedic Systems*, *supra*, 202 Cal.App.4th at p. 544; see *Eastwood*, *supra*, 149 Cal.App.4th at p. 417, fn. 6.)  LTV does not dispute these additional elements, because it knew it was using CyberGuy material pursuant to its contract with Tribune Company, and it used the CyberGuy material for a commercial purpose.  Section 3344, subdivision (f), however, contains an additional requirement that the owners or employees of certain mediums used for advertising, including television stations, have "knowledge of the unauthorized use" in order to be liable.  As LTV owns television stations, subdivision (f) applies to it.  Under the MSA, LTV relied on Tribune Company to provide it with material for LTV's websites, and Tribune Company agreed that LTV's access would be "strictly limited to the rights and obligations contained within [] third-party vendor agreements" such as plaintiffs' Agreement with KTLA.  LTV then passively received Knutsson's material as the operators of the Tribune Technology Platform pushed the content onto LTV websites.  Plaintiffs thus cannot prove LTV's liability under section 3344 because LTV had no knowledge of the allegedly unauthorized use, even if it were without consent.  Summary judgment for LTV was warranted on this cause of action for this reason as well.

## IV.  Unfair Business Practices

Plaintiffs also alleged that LTV violated Business and Professions Code section 17200 et. seq., the unfair competition law.  Section 17200 provides a private cause of action for any "unlawful, unfair or fraudulent business practice and unfair, deceptive, untrue or misleading advertising."  Section 17200, however, is not a substitute for a tort or contract action, and it generally is limited to providing injunctive relief and restitution to prevent ongoing or threatened acts of unfair competition.  (*Zhang v. Superior Court*

(2013) 57 Cal.4th 364, 371.)  Our Supreme Court has stated that "'section 17200 "borrows" violations of other laws and treats them as unlawful practices' that the unfair competition law makes independently actionable.  (*State Farm Fire & Casualty Co. v.* [*Superior Court*] (1996) 45 Cal.App.4th 1093, 1103, citing *Farmers Ins. Exchange v. Superior Court* [(1992) 2 Cal.4th 377, 383])."  (*Cel-Tech Communications, Inc. v. L.A. Cellular Telephone Co.* (1999) 20 Cal.4th 163, 180.)

Here, as alleged against LTV, the sole factual basis for the section 17200 claim is the same as for the misappropriation tort discussed in section II above.  Plaintiffs seek the precise monetary damages that they seek in the misappropriation cause of action.  Because summary judgment in favor of LTV was proper on the cause of action that the section 17200 claim "borrows," summary judgment is likewise warranted on the unfair business practices claim.

**DISPOSITION**

The alternative writ is discharged and the stay previously imposed is lifted. A peremptory writ shall issue directing respondent court to vacate its April 4, 2016, order denying LTV's summary judgment motion and enter a new and different order granting that motion. Costs in this original proceeding are awarded to LTV.

CERTIFIED FOR PUBLICATION

RAPHAEL, J.[*]

We concur:

TURNER, P. J.

KRIEGLER, J.

---

[*]  Judge of the Superior Court of Los Angeles County, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.